OPINION OF THE COURT
William D. Friedmann, J.
This suppression motion places in question the propriety of a lineup identification procedure that involves a suspect with a distinctive facial deformity; a glass eye. This motion also challenges the propriety of conducting a lineup on the absence of counsel, prior to the start of adversarial judicial proceedings, when the suspect’s counsel in an unrelated case has requested an adjournment of the lineup to the next day.
RELEVANT PROCEEDINGS
The Grand Jury of Queens County by two separate indictments charges the defendant with robbery in the first degree *197 (B felony, indictment No. 3829/84) and with grand larceny in the third degree (E felony, indictment No. 3888/84). Defendant moves to suppress evidence of all identification testimony connected to these two indictments which could potentially be offered against him at trial. The court conducted a joint Wade hearing to make findings of fact essential to a determination of that motion. (CPL 710.60 [4].)
CONTENTIONS
Defendant, claiming to be aggrieved by the improper and suggestive identification procedure utilized, and having a reasonable belief that the identifications thus obtained will be used against him at trial, seeks an order suppressing all such identification testimony. In particular, he contends that the lineup identifications utilized in both proceedings should be suppressed because they were the "fruit” of an illegal seizure of him. In addition, he contends that because of his uniquely distinguishing facial appearance, the same lineup shown to both complainants, was impermissibly suggestive and conducive to irreparable misidentification. Finally, he argues that the lineup identification testimony must be suppressed since his counsel in another pending case was not given a reasonable opportunity to attend the lineup shown to both complainants.
The People contend that the lineups were not unnecessarily suggestive and did not violate defendant’s due process rights. In addition, the People contend that there was no illegal seizure of the defendant and that defendant had no right to counsel at the lineups since they were held prior to the filing of an accusatory instrument. Finally, even if testimony regarding the out-of-court identifications is suppressed, the People contend that the complaining witnesses should be allowed to make in-court identifications of the accused because there are adequate independent sources to make such identifications at trial. In addition, this court will consider the admissibility of testimony concerning an inadvertent viewing of the defendant by the witness in the course of the Wade hearing, although neither party specifically raised this point in their memorandums in this motion.
FINDINGS OF FACT
The People called three witnesses, Felicia Powers, Bibi Singh, and Detective Philip Fehr of the 103rd Precinct. The *198 defense called one witness, George A. Whitley, Esq., of the Legal Aid Society. The court gives credence to their testimony.
Felicia Powers, the complainant in indictment number 3888/84, testified that at about 12:30 in the afternoon on November 29, 1983, while she was on her lunch break, she was in the vicinity of 185th Street and Hillside Avenue in Queens County. There she noticed a man standing on the corner of 185th Street. The man told her he was lost. Ms. Powers tried to be helpful to the "lost man” and to assist in finding his way. A "pedestrian” passed by and the "lost man” enlisted this person’s aid. The three, Ms. Powers, the "lost man” and the "pedestrian” walked to the next block and encountered a man with a blue car. The three went into the blue car with the driver of the car. While inside, the "lost man” persuaded Ms. Powers to go to her bank and withdraw money from her account. The "lost man” claimed not to trust banks, and he offered Ms. Powers $500 to make a demonstration that withdrawals were possible.
Ms. Powers testified that she went with the three men to her bank and was escorted by the driver of the car into the bank. She withdrew $1,000 from her account and went back to the car with the man. The driver asked her for the money and he wrapped it in a handkerchief with other money. The "lost man” took the bundle and shoved it into her pocketbook. Ms. Powers testified she did not get a chance to check the bundle then. She testified that she was then hurriedly escorted out of the car. When she went back to work, she discovered that the handkerchief was filled with tissues. The whole con game consumed about a half an hour during daylight hours.
The next day at One Police Plaza, New York, New York, Ms. Powers looked through books of photographs in an effort to identify any of the con men. Ms. Powers testified that she looked at between 400 and 600 photographs provided to her by the police. She was able to identify one of the men who were in the car: the "pedestrian.”
On July 16, 1984, eight months later, Ms. Powers identified the defendant, James Tatum, from a lineup of six men. She viewed it through a one-way glass. A police officer asked her if she could identify the man she had identified in the photographs who was the "pedestrian.” After a few seconds, she picked out number two, the defendant, from the lineup.
A photograph of the lineup shows six black men seated behind a table. They are holding signs with numbers on them *199 ranging from one to six. The lineup report indicates that the men ranged in age from 25 to 48. Their heights were around six feet, one inch, give or take two inches. The defendant, however, was the only participant with a noticeable facial disfigurement: a glass eye. Ms. Powers testified that the description she gave to the police following the con game was that the “pedestrian” was a man in his early to late forties with dark skin, pock marks, a short afro, glasses, and a crooked eye.
At the hearing, Bibi Singh, the complainant in indictment number 3829/84, testified that at 1:30 in the afternoon on July 3, 1984, she was in the vicinity of 159-12 Hillside Avenue in Queens County. She was taking her jewelry to the bank. She was accosted by a man who put his hand around her neck. She testified that the man had a gun in a paper bag and put it under her arm. He took her into a car and told her, “Don’t say anything.” In the car was a black man in the back seat. The man who forced her into the car ordered her to remove everything she had in her pocketbook. She removed $110, her jewelry, and a bankbook indicating that she had $450 in her account. Ms. Singh testified that she was in the car 30 minutes with the two men. The man who had grabbed her on the street sat in the front seat of the car and drove while Ms. Singh sat in the back with the other man. The driver drove very slowly, however, and kept turning around to the back seat to face Ms. Singh. They drove to her bank and the driver accompanied her into the bank. While saying, "Don’t say anything,” the driver hugged and kissed her neck as they waited on line in the bank. She took her money out of the bank and they left. The incident in the bank took 30 minutes. The men drove around with Ms. Singh for another 30 minutes and then they let her out. Ms. Singh testified she had an unobstructed view of the man who accosted her on the street in broad daylight, drove her around in the car, escorted her into the bank, and then drove her around again until she was released. She testified that she recalled he had a "funny” eye.
When Ms. Singh arrived at home she called the police, and she told them what had happened. The next day she went to Manhattan and viewed photographs in an attempt to identify the men who had robbed her. She viewed 20 books of photographs, each with many photographs. She picked out a photograph of the man who had first accosted her on the street.
On July 16, 1984, almost two weeks after the incident, Ms. *200 Singh viewed a lineup that had the same composition as the lineup viewed by Ms. Powers that same day. Ms. Singh immediately identified the defendant James Tatum.
The defendant had been picked up by the police while he was before a judge in Manhattan Criminal Court on an unrelated matter. Mr. Tatum had counsel on that charge: Mr. George Whitley. When the police came to arrange for the defendant to appear in a lineup on July 16, 1984, the attorney representing the defendant at that time requested to appear at the lineup. The police told him it would be held that night and the Manhattan judge emphasized that the attorney was on notice to go out to Queens for the lineup. The attorney, a Legal Aid Society attorney, however, was working night arraignments in Manhattan and could not get away to Queens that night. The attorney was unable to get anyone from either Manhattan or Queens branches of the Legal Aid Society to view the lineup in his stead. Consequently, the defendant was placed in the lineup, viewed by both Ms. Powers and Ms. Singh on July 16, 1984, without counsel present.
On March 12, 1985, during a continued Wade hearing, the complainant, Bibi Singh, was in the courtroom while the defendant was present. Defendant’s attorney then, Joseph DeFelice, prior to the start of any questioning of the witness, approached the Bench and requested that the witness be excused. The attorney, after the witness had been escorted from the room, informed the court that the defendant did not wish to be in the courtroom while the witness testified. The attorney was unaware of this wish until the witness and the defendant were already in the courtroom together for a short while. The court complied with the defendant’s request and he was taken outside. During direct examination of Ms. Singh at the Wade hearing that same day, she testified that she recognized the defendant while he was sitting in the courtroom.
CONCLUSIONS OF LAW
The defendant seeks to suppress all identification testimony. With respect to the suppression of identification testimony, the People bear the burden of going forward to show that there has not been a violation of due process. The burden of proving a violation of due process is on the defendant. (People v Rahming, 26 NY2d 411; People v Ballott, 20 NY2d 600.) Should the defendant establish a violation of due process, the burden shifts to the People to show, by "clear and convincing” *201 evidence, that the in-court identification has an independent source. (United States v Wade, 388 US 218; People v Rahming, supra; People v Ballott, supra.)
PROPRIETY OF THE LINEUP
Defendant argues that because of his unique appearance the lineup was inherently unfair and unduly suggestive and improper. To support this proposition the defendant directs the court to the case of People v Sapp (98 AD2d 784 [1983]). That case involved a defendant who was the only one in a lineup wearing a "lamb jacket” that had figured prominently in the witness’ description of the perpetrator. (See also, People v Johnson, 79 AD2d 617 [2d Dept 1980].) In Sapp, the lineup was deemed unnecessarily suggestive and conducive to irreparable misidentification, and the evidence of the identification was suppressed. (People v Sapp, supra.) The case at bar, however, is distinguishable from both Sapp and Johnson because the distinctive characteristic of the defendant is not an article of clothing that can be removed. Instead, it is a facial deformity.
The case law of New York does not require that all of the stand-ins or fillers in a lineup be obvious fraternal twins of a suspect. The stand-ins, however, must appear reasonably similar to the defendant in their physical characteristics. (People v Anthony, 109 Misc 2d 433 [Sup Ct, NY County 1980].) "A critical issue presented in this, and in many other Wade hearings, is whether or not the appearances of the defendant and the stand-ins were reasonably similar so as to avoid undue suggestion.” (People v Anthony, supra, p 435; United States v Wade, 388 US 218, 233, supra.) When the stand-ins have been so hastily chosen so that only one other person could possibly fit the description given to the police, the lineup will be considered unduly suggestive. (People v Lebron, 46 AD2d 776 [2d Dept 1974].)
There does not appear to be any reported New York case that relates to the fairness of placing into a lineup an individual with a uniquely distinguishing facial characteristic. In People v Thompson (NYLJ, May 31, 1985, p 13, col 3), however, the defendant argues that the lineup used by the police was constitutionally defective because the defendant was the only person in the lineup with bloodshot eyes, a characteristic said by the witnesses to belong to the perpetrator. The court in Thompson ruled that while the witnesses noticed the redness in the defendant’s eyes, the photograph indicated that *202 this redness was not "remarkable.” (People v Thompson, supra.) In the case at bar, however, the defendant’s facial characteristic is remarkable. Just as was the case in United States v Sanders (479 F2d 1193 [DC Cir 1973]), the defendant "fairly leaps out” as the one person who is different, a judgment that can be made without knowledge of what the witnesses said. The court in Sanders went on to note that "[w]hen there is added to the equation the fact that these are distinctive characteristics attributed to the robber * * * and that he was the one man whose photograph had previously been shown to both witnesses, it was well-nigh inevitable that he would be chosen in the circumstances.” (United States v Sanders, 479 F2d 1193, 1197, supra; Foster v California, 394 US 440, 443, supra; Simmons v United States, 390 US 377, 383-384 [1968].)
Other jurisdictions have allowed such identifications to be admitted into evidence. A California court held that a photographic array showing only one person with a birthmark, the defendant, was not unduly suggestive. (People v Castellano, 79 Cal App 3d 844, 145 Cal Rptr 264 [1978].) Similarly, a Missouri court held that dissimilarity in physical appearance alone is insufficient to establish impermissible suggestiveness. (State v Haymon, 639 SW2d 843 [Mo App 1982].) In Haymon, the court considered the case of a defendant with a substantially disfigured chin, and it determined that this inherent physical abnormality would preclude the possibility of providing subjects reasonably close in appearance. Nevertheless, the court held that testimony about an identification would not be suppressed as the result of an impermissibly suggestive procedure because the likelihood of misidentification was considered nonexistent. (State v Haymon, supra.) This sort of holding is consistent with the Supreme Court’s rulings in Manson v Brathwaite (432 US 98 [1977]) and Neil v Biggers (409 US 188 [1972]). In Manson, the court held that: "reliability is the linchpin in determining the admissibility of identification testimony for both pre- and post -Stovall confrontations. The factors * * * are set out in Biggers. [Citation omitted.] These include the opportunity of the witness to view the criminal at the time of the crime, the witness’ degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself.” (Manson v Brathwaite, supra, p 114.) The *203 New York Court of Appeals has noted, however, that: "In the past Federal constitutional guarantees, as interpreted by the Supreme Court, generally satisfied and often exceeded the requirements of comparable provisions of the State Constitution. But there would be no need for an independent State Bill of Rights if that were always the case * * * this court has frequently found that the State Constitution affords additional protections above the bare minimum mandated by Federal Law”. (People v Adams, 53 NY2d 241, 250 [1981].) In People v Blake (35 NY2d 331 [1974]), the New York Court of Appeals emphasized the value of identification procedures, such as lineups: "There is a trenchant need for quick verification of identity, cause for arrest and detention, and the desirability of early or even immediate release of those falsely accused of crime”. "Speedy viewings * * * benefit both law enforcement and the defendant”. (35 NY2d, at pp 336, 337; People v Logan, 25 NY2d 184, 194 [1969].) If the witness makes a positive identification, the police can direct their resources to other investigations. If the witness does not make an identification, the suspect can be released from custody, and the police can resume their investigation.
The Adams court noted, however, that when a witness is able to make an untainted in-court identification, admission into evidence of an out-of-court identification made under suggestive circumstances only serves one prosecutorial purpose: to bolster the People’s case. "We have never held that it is proper to admit evidence of a suggestive pretrial identification. Indeed it seems to have been understood by courts and prosecutors that a pretrial identification would not be admissible if the procedures were unnecessarily suggestive”. (People v Adams, supra, pp 251-252.) Thus, if the identification procedure used was "unduly suggestive” or "unnecessarily suggestive” then testimony concerning any out-of-court identification made would be inadmissible, regardless of the reliability of the identification.
In the present case, the police made an effort to find stand-ins reasonably close in age, weight and height to the defendant. In addition, all the men in the lineup were black. No attempt, however, was made to conceal the defendant’s glass eye. While it is certainly true that "[p]olice stations are not theatrical casting offices” (United States v Lewis, 547 F2d 1030, 1035 [8th Cir 1976], cert denied 429 US 1111 [1977]), some effort in this case could have been attempted to remove any suggestiveness. (See, State v Burns, 671 SW2d 306 [Mo *204 App 1984]; People v Cronk, NYLJ, Jan. 22, 1982, p 14, col 4.) In Cronk, the police had a description of a perpetrator who was supposed to be bald with a moustache. In addition, the perpetrator was alleged to be a policeman. The investigator did not have enough photographs of balding policemen to construct a photographic lineup, so he ingeniously used white tabs to conceal this characteristic of the defendant and the scalps of the few fillers.
The People’s brief submitted in opposition to the motion to suppress the identifications argues that the suggestiveness of the lineup was necessary because the defendant’s unique physical characteristic could not be duplicated in other fillers except by inhuman and cruel means. No reasonable person could possibly suggest that such measures should be taken. The People’s reductio ad absurdum argument misses the point. A simple eye patch provided to each of the lineup participants or a hand over an eye would have sufficed to remove any undue suggestiveness of the procedure. This court is convinced that the lineup viewed by both witnesses was unduly suggestive since the defendant was the only one with such a "grossly dissimilar * * * appearance”. (United States v Wade, 388 US 218, 233, supra.) This dissimilarity could have been concealed. Such a concealment would be scarcely more than is used when all the subjects of a lineup are seated in order to conceal their heights or weights (e.g., People v Castro, NYLJ, Aug. 23, 1983, p 7, col 3), or when white tabs are used to conceal a bald head. (People v Cronk, NYLJ, Jan. 22, 1982, p 14, col 4, supra.) Thus, in the absence of such a precaution, the lineup identifications must be suppressed because they were unnecessarily suggestive.
Undoubtedly, this places a burden on the police to exercise care when conducting lineups. Indeed, "[c]ourts have pointed to the burden on law enforcement officials to find lineup stand-ins with physical features approximating those of the suspect as a reason for approving what otherwise might have been suggestive lineups.” (Sobel, Eyewitness Identification, at p 10-7 [1984]; United States v Barron, 575 F2d 752 [9th Cir 1978].) The Adams court has held, however, that: "if the jury finds the in-court identification [less than] convincing it should not be permitted to resolve its doubts by relying on the fact that the witness had identified the defendant on a prior occasion if that identification was made under inherently suggestive circumstances. Similarly, if the witness is unable to identify the defendant at trial the defendant’s conviction *205 should not rest solely upon evidence of a pretrial identification made under circumstances which were likely to produce an unreliable result.” (People v Adams, 53 NY2d 241, 251, supra.)
RIGHT TO COUNSEL AT LINEUP
Even if testimony concerning the out-of-court lineup identifications was not to be suppressed because of the above-discussed lineup procedure, the evidence of such out-of-court identifications would have to be suppressed because defendant’s counsel in an unrelated case known to the police was not granted a reasonable adjournment in order to attend the lineup.
Even though this court may have its own reservations as to when a criminal proceeding effectively starts in order to trigger the right to counsel, it is clearly established by Federal and State case law that there is no right to counsel for an accused at a lineup conducted before the filing of an accusatory instrument. (People v Dawson, 101 AD2d 816 [2d Dept 1984]; People v Hawkins, 55 NY2d 474, cert denied 459 US 846 [1982]; Kirby v Illinois, 406 US 682 [1972].) In Kirby, the Supreme Court significantly narrowed the protections embodied in its previous decisional trilogy Wade, Gilbert, and Stovall. (United States v Wade, 388 US 218, supra; Gilbert v California, 388 US 263 [1967]; Stovall v Denno, 388 US 293 [1967].) In Wade, the court mandated that since the postindictment lineup was a critical state of the prosecution, the defendant was " 'as much entitled to such aid [of counsel] * * * as at the trial itself.’ ” (United States v Wade, supra, p 237; see also, Powell v Alabama, 287 US 45.) In Kirby, however, the court limited this right to counsel to the point when adversarial prosecutorial proceedings had begun. (Kirby v Illinois, supra, p 689.) The New York Court of Appeals noted, thereafter, that for the purposes of applying the Federal rule stated in Kirby, a criminal action begins with the filing of an accusatory instrument as defined by statute. (People v Blake, 35 NY2d 331, supra.) "After arrest but before the filing of an accusatory instrument the presence of counsel is not mandated, but is desirable.” (People v Blake, supra, p 340.) In People v Hawkins, the New York Court of Appeals held that the State has no obligation to supply counsel at investigatory lineups. Nevertheless, the Hawkins court noted that if a suspect already has counsel his attorney may not be excluded from the lineup proceedings.
*206 "That does not mean, however, that the police must notify counsel of an impending investigatory lineup or that counsel is entitled to a lengthy adjournment at this stage of the investigatory process. In view of the limited benefits which counsel provides at this stage, the police need not suspend the lineup in anticipation of the arrival of counsel if this would cause unreasonable delay. Pertinent to this consideration is whether the delay would result in significant inconvenience to the witnesses or would undermine the substantial advantages of a prompt identification confrontation.” (People v Hawkins, supra, p 487.) This ruling is essentially the same as laid down by the court in Blake. "When an accused, at any stage, before or after arraignment, to the knowledge of the law enforcement agencies, already has counsel, his right or access to counsel may not be denied”. "[0]nce the general right to counsel attaches in a criminal context, even if defendant has not yet obtained or received a court-assigned lawyer, the right to have counsel present, where appropriate, at subsequent procedures such as a corporeal identification viewing, also exists. In all such situations should the right or access to counsel be denied, without sufficient excuse or explanation establishing an inevitable exigency, an identification should be excluded.” (People v Blake, 35 NY2d 331, 338-339, supra.)
In People v Seymour (104 Misc 2d 482) the court looked at this language used by the Court of Appeals in People v Blake: " 'the failure to arrange for the presence at the lineup of a defendant’s lawyer, then seeking access to his client, is suggestive of a violation, in spirit at least, of the principles previously laid down by this court’ ”. (People v Blake, supra, p 339.) "The Court of Appeals could only have been referring to a situation where a defendant had not yet had an accusatory instrument filed against him and where the police knew that an attorney was endeavoring to reach the arrestee.” (People v Seymour, 104 Misc 2d 482, 485 [County Ct, Suffolk County 1980].) This sort of situation existed for the defendant in the case at bar.
In the present case the police were well aware that the defendant had counsel in an unrelated matter. In fact, they were able to gain custody of the defendant only after he was paroled to the Queens police while being held in custody in Manhattan during an arraignment. The police spoke a few times with the defendant’s Legal Aid Society attorney and they knew that he desired to attend the lineup, or, failing that, get a substitute. At around 9:30 p.m. of the evening of *207 July 16, 1984, the attorney, Mr. Whitley, informed the police that he would not be able to attend the lineup. In addition, he had not been able to contact anyone from the Legal Aid Society in order that they might attend. The attorney requested that the lineup not be held until the next day. This request was reasonable and should have been granted. (People v Johnson, NYLJ, Sept. 13, 1982, p 14, col 3.) In Johnson, the court outlined the circumstances that should be considered when determining the reasonableness of an adjournment of a lineup procedure. In particular, the court looked at the length of time between the occurrence of the incident and the time of the lineup, the availability of the witnesses for the adjourned date and the desirability to an innocent suspect of a prompt lineup, in that he would be released if not identified. In addition, this court must point out the important value that a prompt identification procedure has to law enforcement officials endeavoring to apprehend perpetrators of violent felonies.
The court makes the following conclusions based on its application of the foregoing criteria to the circumstances of the case at bar; an adjournment of one day would not have been a significant delay affecting the ability of either Ms. Powers or Ms. Singh to recall the events of the crimes they were victims of; it does not appear that there would have been any problem in assembling the witnesses the next day; the adjournment, if granted, would have been at the request of the defendant’s counsel, and, therefore, the defendant could be viewed as choosing to endure any additional incarceration required until the lineup could be held with his counsel present. Finally, there is no testimony tending to show that a delay of one day would have been detrimental to the police’s investigation of the crimes. Therefore, since the defendant’s attorney in the other unrelated criminal proceeding was not granted a reasonable and short adjournment under the circumstances, the lineup identification should be suppressed. (People v Blake, supra, p 339.)
The case at bar is distinguishable from People v Styles (90 Misc 2d 861 [Sup Ct, NY County 1977]), and People v Poywing (90 Misc 2d 197 [Sup Ct, NY County 1977]), because in those cases adjournments had already been granted at least once to the defense attorneys in order to give them a chance to view the lineups. In addition, the instant case is distinguishable from People v Seymour (104 Misc 2d 482, supra), because in Seymour the crime for which the lineup was being held *208 occurred after the defendant was released from custody on the unrelated criminal matter for which he had an attorney. Several months after his release from a custodial situation the defendant in Seymour sought to retain the benefit of having counsel on the unrelated pending charge. In the case at bar, the defendant was only transferred for a few hours from his continuing custodial situation.
PHOTO ARRAY
This court finds under the test outlined in Simmons v United States (390 US 377, 384 [1968]) that the photographic identification procedures utilized with respect to both complaining witnesses were not so "impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.” The witnesses looked through many, many photographs. The police did nothing to indicate to either witness that they wanted any particular photograph chosen. Finally, there was no testimony indicating that the pictures were, in and of themselves, unduly suggestive.
ILLEGAL SEIZURE
The defendant’s contention that his detention was an illegal seizure is without merit; once the defendant was selected from the photo array, probable cause to arrest him existed. (People v Middleton, 125 Misc 2d 634 [Sup Ct, Kings County 1984]; People v Figueroa, 122 Misc 2d 631 [Sup Ct, NY County 1984].) Therefore, the People have met their burden of proving that there was probable cause for the arrest and the arrest was properly made without an intrusion into the home of the defendant. (Payton v New York, 445 US 573 [1980].)
IN-COURT IDENTIFICATIONS — INDEPENDENT SOURCE
Despite the fact that testimony concerning the lineup identifications of the defendant will be suppressed, both complaining witnesses will be allowed to make in-court identifications of the accused because the People produced substantial evidence proving "clearly and convincingly” that the witnesses had ample on-the-scene opportunities to form independent sources for in-court identifications. (United States v Wade, 388 US 218, 240-241, supra.) Considering the various factors set out in Wade for determining whether the witnesses’ in-court identifications should be permitted, this court finds that more than ample opportunities existed at the scene of each crime for the *209 witnesses to form independent sources; there were no discrepancies between any prelineup descriptions given of the perpetrators and the defendant’s actual description; there was no identification of another person; there were positive identifications of the defendant by photograph; neither witness failed to identify the defendant on a prior occasion. There was, however, a substantial lapse of time between the time of the alleged act upon complainant Powers and her subsequent lineup identification of the defendant. Nevertheless, this one factor in the defendant’s favor seems outweighed by the ample time that Ms. Powers had to observe the perpetrator during the course of the incident. Accordingly, the motion to suppress the prospective in-court identifications is denied since both witnesses had independent sources from which to make untainted identifications. (People v Damon, 24 NY2d 256 [1969]; People v Figueroa, 122 Misc 2d 631, supra; People v Rolston, 109 AD2d 854 [2d Dept 1985]; People v Odierno, 121 Misc 2d 323 [Sup Ct, Bronx County 1983]; People v Lloyd, 108 AD2d 873 [2d Dept 1985].)
PRETRIAL HEARING IDENTIFICATION
The defendant had the right to waive his appearance at the Wade hearing. (See, People v Cummings, 109 AD2d 748 [2d Dept 1985].) Unfortunately, the defendant was briefly in the courtroom because of a failure of communication between the defendant and his attorney. The circumstances of this inadvertent and wholly unarranged viewing of the defendant by the witness were, in a sense, accidental. This chance mistaken viewing was not made unduly suggestive by any police or a prosecutorial action. Therefore, the circumstances of this confrontation in the course of the Wade hearing do not seem so "impermissibly suggestive” and conducive to "irreparable misidentification” to warrant exclusion from the trial testimony concerning this identification. (People v Cummings, 109 AD2d 748, 749, supra; see also, People v Logan, 25 NY2d 184 [1969]; People v Burton, 106 AD2d 652 [2d Dept 1984].)
Indeed, a Wade hearing is considered part of the criminal proceeding for purposes of CPL 60.30. (People v Annis, 48 AD2d 622 [1st Dept 1975].)
Therefore, this identification in the courtroom, out of the jury’s presence, will have to be assessed by the jury in the same manner as any other identification made in the course of a criminal proceeding, and it will be for them to determine the credibility of the witness. (People v Annis, supra, p 623.)
*210 SUMMARY
The motion to suppress identification is granted with respect to the lineup identifications made by both witnesses. The motion to suppress the hearing identification and in-court identification testimony is denied.