THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
WILLIAM OSGOOD, Appellant.

Second Department, October 12, 1982

**APPEARANCES OF COUNSEL**

*John B. Mullady* for appellant.

*Elizabeth Holtzman, District Attorney* (*Barbara D. Underwood, Michael Yoeli* and *Debra W. Petrover* of counsel), for respondent.

TITONE, J. P.

On January 15, 1980 Irwin Gladstein and Mark Egan, a college student working as a stock boy, were in a milk store managed by Gladstein at Fourth and Marine Avenues in Brooklyn. At 9:25 P.M., a man later identifed as the defendant walked in carrying a shotgun and announced a holdup. Gladstein, standing five or six feet away from the intruder in the front of the well-lit store, looked at the man and said, "You must be kidding." The robber cocked the gun open and showed Gladstein that it was loaded. Gladstein called to Egan, who was also in the front of the store near a cash register. The perpetrator faced Egan, pointed the gun at him and told him not to move. He then pointed the gun at Gladstein and forced him to a second cash register. As Gladstein was handing the robber some money, Ralph Dupree, a customer, walked in. Gladstein turned his back and was shot in the left shoulder. He fell wounded and told Egan to call the police; the intruder ran out.

Later that night, Police Officer Peter Rogers received a description of the robber. While on patrol at about 1:00 A.M., Rogers responded to a call at 88th Street and Fourth Avenue. He was told by a bystander that a man had thrown a brick through the window of a bar and grill and that several patrons were chasing the man down 87th Street. Rogers drove down the street whereupon he observed the defendant being held by a man who said that he had seen the defendant throw the brick. The defendant was placed under arrest and taken to the precinct; it was found that he had 26 bags of marihuana in his possession.

After he saw the defendant, Rogers thought that he matched the description of the robber. Rogers called Egan from the precinct and informed him that he believed they had a suspect. No description of the defendant was given to Egan over the telephone; Egan, who was asked to come to the precinct, was merely told that the suspect matched the description. When Egan arrived at about 2:00 A.M. Rogers asked him to remain near the front door. Rogers explained that he would bring the suspect to the front desk, and that he wanted to know if this was the person who had shot

Gladstein. Rogers brought the defendant, who was in handcuffs, to the front desk. Egan looked at him for about a minute but did not say anything. Rogers returned the defendant to the holding pen, which was visible to anyone who walked into the ground floor area. He then went over to Egan and asked if the defendant was the person who had committed the crime. Egan responded affirmatively, stating that he remembered the "dark blue jacket, light pants, blonde hair moustache". Egan was then told he could leave.

A few minutes later, a detective took Egan upstairs to a viewing room where the defendant was talking to another detective. Egan looked at the defendant, was again asked if he recognized him and once more responded that he did. Later that morning, two detectives went to Egan's house, showed him a photograph of the defendant, and asked if he had ever seen the man. Egan stated that he recognized him as the robber.

Egan returned to the precinct that evening at the request of Detective Louis Russo. Russo, who was unaware that Egan had already identified the defendant in the showup, explained to Egan that he was only to identify someone if he were 95% to 100% certain of his identity. Egan viewed a lineup, picked out the defendant and said "I'm positive he's the one". Ralph Dupree, the customer who had walked into the store during the holdup, also viewed the lineup, but was unable to make an identification.

The attorney who represented the defendant during his Criminal Court appearance on the charges stemming from the rock throwing incident had been informed that the defendant was a robbery suspect. He called the precinct and told the police that he wanted to be present at any proposed lineup. The lineup was postponed for several hours but when the attorney was unable to appear, the Assistant District Attorney in charge of the case authorized that it be held.

Egan went to the defendant's arraignment at the District Attorney's request on the morning following the lineup, with his father and Irwin Gladstein's son, Jay.

Egan and Jay Gladstein sat in the courtroom a few benches behind the defendant. Egan told Jay "[t]hat's the guy I picked out of the lineup".

Irwin Gladstein was still in the hospital, recovering from his injuries in late January, 1980, approximately 10 days after the arraignment. Detective Russo showed him a folder which contained six oval police mug shots, including one of the defendant taken in 1971. Russo asked Gladstein if he could identify the perpetrator. Gladstein pick out the defendant's picture.

Russo testified at a *Wade* hearing that he was not sure whether the picture of the defendant or any of the other five photos depicted men with moustaches nor did Irwin Gladstein recall whether he had mentioned a moustache to the police when he first described the robber.

Russo then showed a lineup photograph to Gladstein at the hospital. This was the lineup at which Egan identified the defendant although Gladstein was not informed of this fact. Defendant was the only person who appeared in both the photo array and the lineup photo. After Gladstein picked the defendant from the lineup photo, Russo told him that the defendant had been arrested and charged with the crime and that Egan had also identified him.

After he picked out the defendant's picture, Gladstein was asked to describe the robber. Gladstein described him as approximately 185 pounds, 6 feet 1 inch to 6 feet 2 inches, white, with a little moustache and a hat with a white ball on it.

At the request of Assistant District Attorney Joseph Generelli, Gladstein, accompanied by his son, went to the office of the District Attorney on March 27, 1980, in order to view a lineup which had been requested by the defendant's second attorney (not the one who failed to appear at the lineup viewed by Egan). Gladstein was asked to wait on the third floor until the lineup was arranged. He was then to be accompanied to the lineup room on the fourth floor.

However, Gladstein and his son took the elevator directly to the fourth floor. When they got off the elevator, they encountered the defendant, who was waiting in the

hallway with his attorney. Gladstein shook his son's sleeve and said, "Jay, there he is right in front of me". Generelli, who was then informed of what happened, immediately canceled the lineup and formally questioned Gladstein and his son regarding the encounter.

During the *Wade* hearing both Gladstein and Egan identified the defendant as the robber. Gladstein did not recall whether he had mentioned a moustache to the police when he first described the robber. At the hearing, Gladstein stated that the man who robbed him had a little moustache and wore a hat with a little ball on top of it and a ski jacket which ended just above the knee. The jacket was dark and had a hood which only partially covered his head. Gladstein distinguished the jacket from a pea coat, which he described as very short.

Egan testified that when he looked at the lineup, he recognized the defendant from the incident at the store and not from the showup or photograph. He further stated that the robber wore a dark, blue coat that went just below the hips. It was not a ski coat and had no hood but the robber had a hood covering the back of his head. Egan did not recall whether he found out before or after the lineup that the defendant had been arrested for the robbery.

The complaint report was introduced into evidence during Officer Roger's cross-examination. The information in the report described a white male, 26 to 29 years old, 6 feet 2 inches, 215 pounds, with brown hair and wearing a three-quarter length blue pea coat, beige pants and a red hat. There was nothing listed under the section for facial hairs or abnormalities. When the defendant was arrested, he had a moustache and did not have a red hat. The report for the criminal mischief arrest, made out by Rogers, described defendant as a male white, 6 feet 2 inches, 190 pounds, with a moustache, wearing a blue pea coat and beige pants.

Rogers testified that a person who threw a rock through a window would normally receive a desk appearance ticket and immediately be released. The defendant was held in custody because he was suspected of being the milk store robber and also because of his possession of marihuana. Rogers stated that at 1:45 A.M. he could not have put

together a lineup of five other people with defendant's general appearance.

Defendant's second attorney, who was present when the inadvertent "meeting" occurred near the elevator in the District Attorney's office, testified at the hearing. He described the event as previously stated with the following exception: he claimed that Jay Gladstein first pointed defendant out to Irwin Gladstein.

At the conclusion of the *Wade* hearing the court ruled that, except for the single photo shown to Egan, the identification procedures in which Egan and Gladstein participated were not suggestive and, therefore, did not taint the in-court identification. The court also found that Egan's single photo identification, although suggestive, did not taint his in-court identification because Egan had already identified the defendant before viewing the photo. Finally, the court held that even if the out-of-court identifications had been tainted, the in-court identifications would be permissible because they were based on an independent source. Although we agree that the in-court identifications were admissible, we hold that the identification procedures, insofar as they relate to Egan, with the exception of his viewing of the lineup, were suggestive.

After describing the robbery to the police, Egan was subsequently told to come to the precinct and view a suspect, who turned out to be handcuffed. Although informing a witness that he is going to look at a suspect will not, by itself, vitiate an otherwise proper identification (*People v Logan*, 25 NY2d 184, 192, cert den 396 US 1020), in certain circumstances it has been held improper (see *People v Lebron*, 46 AD2d 776; *People v Robles*, 46 AD2d 748). Here, the fact that the defendant was in handcuffs could not help but influence Egan's thinking that the "right man" had been arrested.

It was additionally improper for a showup to be held. The fairness of showup identification procedures is measured by the reasonableness of police actions in light of the surrounding circumstances (*People v Smith*, 63 AD2d 754). Although such procedures may produce reliable identifications of wrongdoers and can be more logically equated with

good police work rather than denial of due process (*People v Smith, supra*), here the defendant persuasively claims that he was not going to be released anyway, due to his alleged drunkenness, so that there was no exigent reason to hold a showup at 2:00 A.M. As Officer Rogers conceded that the defendant was held in custody because he was suspected of being the milk store robber and also because of his possession of marihuana, and was therefore not going to receive a desk appearance ticket, we agree with defendant's contention that Egan should not have been called to view him until preparations had been made to conduct a lineup. There can also be no doubt, as the suppression court found, that showing a photograph of the defendant to Egan on the morning after the showup was a suggestive procedure.

We also note that the following incident occurred during the defendant's trial. During Irwin Gladstein's direct testimony, the Assistant District Attorney referred to the lineup photograph in which defendant appeared and which Egan had identified earlier in the trial. (People's Exhibit 3.) Gladstein was asked if he had ever seen that photo after the robbery but before the lineup Gladstein was supposed to have viewed. Gladstein responded that he saw photographs while in the hospital. The court attempted to clarify the matter. It asked Gladstein if he had ever viewed a live lineup, to which the witness responded in the negative. The Assistant District Attorney then asked Gladstein if he had ever seen that photograph, referring to People's Exhibit 3 in evidence, any time before. The witness blurted out "I think it was — I mean, I saw so many pictures and I picked it right out." Counsel objected and asked for a mistrial. The application was denied. The court then gave immediate curative instructions to the jury to disregard any reference to the picture.

Even though Gladstein later testified that he could not recall if People's Exhibit 3 had been shown to him (despite his recollection that he had seen a lineup photo of the defendant), defendant is correct in asserting that the "logical and real conclusion to be drawn is that the witness identified that photo as well." The generally accepted rule is that a witness may not testify on the People's direct case regarding a photographic identification of the defendant;

such testimony constitutes impermissible bolstering (*People v Griffin,* 29 NY2d 91, 93; *People v Johnson,* 32 NY2d 814; *People v Baskerville,* 32 AD2d 555, affd 27 NY2d 966). It has been held that error of this type may be considered harmless only where the evidence of identity is so strong that there is no substantial issue on the point or where an identification has been attacked as a recent fabrication (*People v Favreau,* 77 AD2d 696).

It is additionally noted that the prosecutor was allowed to read back to Robert Maresca, one of defendant's alibi witnesses, during his rebuttal testimony, portions of Maresca's Grand Jury testimony which may have been damaging to the defendant when Maresca's direct testimony was merely neutral and unhelpful to the prosecution.

█ A party has the right to impeach his own witness where the latter gives trial testimony, upon material issues, that tends to disprove the party's position and is contradictory to the testimony given by that witness at a prior proceeding (CPL 60.35; *People v Williams,* 47 AD2d 963). Here, the prosecutor almost immediately sought to read Maresca's Grand Jury testimony to allegedly refresh his recollection. He was permitted to read to Maresca (and the jury) portions of the testimony when Maresca was unsure of certain details regarding the events of January 15. The Grand Jury testimony did not contradict Maresca's trial testimony but merely indicated that Maresca was not watching the defendant during the entire time that the defendant claimed he was in a bar (not the one in which he threw the rock through the window) playing darts. It was thus improper for the prosecutor, under the guise of impeaching Maresca, to place before the jury material which could not otherwise be introduced in evidence because of its extrajudicial nature (see *People v Fitzpatrick,* 40 NY2d 44, 50).

█ While in and of themselves the foregoing errors may have been harmless, in the aggregate they must be deemed prejudicial, denying defendant his due process right to a fair trial, especially in a case such as this in which the issue of identification was closely contested and 10 alibi witnesses testified that the defendant was with them in a bar playing darts during the time of the robbery.

Accordingly, the judgment of conviction must be reversed and the matter remanded for a new trial. We note that the other issues raised by the defendant have been considered and found to be without merit.

LAZER, MANGANO and GIBBONS, JJ., concur.

Judgment of the Supreme Court, Kings County, rendered May 28, 1981, reversed, on the law, and new trial ordered.