THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
ANTONIO GONZALEZ, Appellant.

First Department, December 31, 1991

## APPEARANCES OF COUNSEL

*Tina L. Mazza* of counsel *(E. Joshua Rosenkranz,* attorney), for appellant.

*Ellyn Polshek* of counsel *(Phyllis A. Monroe* with her on the brief; *Robert M. Morgenthau, District Attorney,* attorney), for respondent.

## OPINION OF THE COURT

Ross, J.

This appeal presents an issue as to whether defendant was identified as the perpetrator of a robbery as the result of an allegedly suggestive lineup.

On or about November 10, 1988, the defendant was arrested in New York County, and subsequently two indictments were returned against him. In the first indictment, number 10424 of 1988, filed on December 1, 1988, a Grand Jury charged defendant with committing the crimes of robbery in the first degree (Penal Law § 160.15 [twelve counts]), attempted robbery in the first degree (Penal Law §§ 110.00, 160.15 [four counts]), sexual abuse in the first degree (Penal Law § 130.65 [two counts]), attempted sodomy in the first degree (Penal Law §§ 110.00, 130.50), and coercion in the first degree (Penal Law § 135.65). Thereafter, in the second indictment, number 4885 of 1989, filed on April 19, 1989, a Grand Jury charged defendant with committing the crimes of robbery in the first degree (two counts), and attempted robbery in the first degree (three counts).

Defendant entered pleas of not guilty to both indictments, and his counsel moved to suppress, *inter alia,* defendant's statements made to the police and all identification testimony. Thereafter, in May and June 1989, *inter alia,* a combined *Huntley (People v Huntley,* 15 NY2d 72 [1965]) and *Wade (United States v Wade,* 388 US 218 [1967]) hearing was held.

At that hearing, several New York City police officers and detectives, as well as a robbery victim, testified for the People. New York City Police Officer John Benson (Officer Benson)

testified that, early in the evening of November 10, 1988, he and his partner, both assigned to the 34th Precinct, were on routine motor patrol, when they received a radio message directing them to the corner of 213th Street and Broadway, New York County. As they were approaching that corner, Officer Benson saw one man holding another man, with a woman standing nearby.

One of the men, later identified as Mr. David Burrows, informed Officer Benson that, after he had heard a woman screaming, he saw the man, who he was now holding and who was later identified as the defendant, running from Inwood Park, carrying a brown pocketbook, and he responded by seizing and holding the defendant, while a bystander summoned the police. At that point, Mr. Burrows gave officer Benson a rubberized hammer handle, as well as the pocketbook, and he told the officer that he had taken both of those items from the defendant. Further, Mr. Burrows explained to Officer Benson that the defendant had attempted to strike him with the hammer handle.

Next, the woman, later identified as Ms. Susan Rivel, told Officer Benson, "that the defendant had punched her in the lip, grabbed her pocketbook * * * inside the park and fled towards Broadway". Also, Ms. Rivel informed the officer that the pocketbook, which Mr. Burrows had recovered from defendant, belonged to her.

After listening to Mr. Burrows and Ms. Rivel, Officer Benson arrested, handcuffed, and searched the defendant, who was subsequently transported to the 34th Precinct.

In November 1988, New York City Police Officer Michael Davis (Officer Davis) was assigned to the Robbery Identification Program, located at the 34th Precinct. Officer Davis testified that, on the evening of defendant's arrest, he received a telephone call at his residence, requesting him to return to the precinct, since a person had just been apprehended for a robbery, who appeared to fit a robbery pattern, which he was investigating.

The robbery pattern developed by Officer Davis indicated that, during September, October, and early November 1988, approximately 14 robberies with similar characteristics, such as the description of the perpetrator, the type of weapon used, the time and location of the event, and the modus operandi, had occurred in several Manhattan parks, mostly in Inwood and Fort Tryon Parks, with a few in Riverside Park. Victims

had collectively described the robber, in substance, as a Hispanic man, between 35 and 45 years of age, who was between 5 foot 7 inches and 5 foot 9 inches tall, weighing between 130 and 150 pounds, and "messy-looking". The robber's technique was to approach a victim, brandishing a gun, usually identified as a "silver automatic", and demand in Spanish or English, "give me your money". Often, when displaying the gun, the robber would "pull the slide back", as if he were "chambering a round". Two of the robberies, fitting Officer Davis' pattern, involved aggravating criminal acts, as follows: In one instance, the robber struck a victim, Mr. Peter Lang, on the head, with the silver automatic, breaking that weapon, and subsequently the police recovered and vouchered a piece of same. Further, in the second instance, he had robbed two women, Ms. Barbara Suarez and Ms. Vivian Ramirez, and then, sexually abused both women, by forcing them at gunpoint to perform, *inter alia,* deviate sexual acts, on each other, and an attempted sodomy.

Three days before defendant's arrest, on or about November 7, 1988, Officer Davis' pattern sheet, containing details of those robberies, was circulated to other precincts, and said sheet came to the attention of New York City Police Detective Michael O'Neil (Detective O'Neil), assigned to the Manhattan Robbery Squad.

Detective O'Neil testified that after examining the pattern sheet, he concluded that the pattern of park robberies committed in the 34th Precinct "was very similar if not identical" to several robberies committed in Central Park, which he was investigating.

According to Detective O'Neil, the victims in the Central Park robberies collectively described the perpetrator as having a "thin build", and carrying what "was either a silver gun or what appeared to be * * * a gun used as a weapon". Further, Detective O'Neil stated those victims did not all agree as to the perpetrator's race, since "[s]ome indicated it was black, some indicated it was a Hispanic".

Prior to defendant's arrest, Detective O'Neil contacted Officer Davis, and advised him that there were similarities between the 34th Precinct robberies and the Central Park robberies.

On the evening of defendant's arrest, at approximately 7:30 P.M., Officer Davis testified he arrived back at the precinct, in time to witness a Spanish-speaking officer administer *Miranda*

warnings to defendant in Spanish from a bilingual *Miranda* warnings form. After defendant acknowledged receiving those warnings, Officer Davis, using the Spanish-speaking officer as a translator, asked the defendant "what happened in regards *[sic]* to the robbery [of Ms. Rivel] that he was arrested for and he * * * admitted that he robbed her, and he got nervous and he got scared and he punched her and he grabbed her bag".

Following defendant's admission of committing the crime against Ms. Rivel, Officer Davis, together with other officers, arranged for a lineup to take place later that evening at the 34th Precinct.

Five stand-ins (fillers) were assembled, who resembled the defendant, in that they were of similar age, race, height, weight, facial hair and skin tone. Officer Davis testified that, while three fillers had salt and pepper colored hair like defendant, two fillers "had dark hair". Further, in view of the fact that defendant was clean-shaven at the time of his arrest, so were all the fillers. Officer Davis testified that defendant was given "his choice of number. He chose to be number one. We [the officers, including Officer Davis] said, everyone * * * sit down and we gave them numbers".

Sometime after 11:00 P.M. that evening, 14 victims of the robberies set forth on the pattern sheet of the 34th Precinct viewed that lineup (Officer Davis' lineup), and seven persons, including Ms. Suarez and Ms. Ramirez, who, as mentioned *supra,* were robbed as well as sexually abused, identified defendant as the robber.

Since Detective O'Neil had been informed by Officer Davis that the defendant had been arrested, and identified as the perpetrator of the 34th Precinct robberies, on the evening of November 11, 1988, in the offices of the Manhattan Robbery Squad, Detective O'Neil arranged for the defendant to be part of a second lineup, which was to be viewed by victims of the Central Park robberies.

Detective O'Neil directed the selection of the five fillers for that lineup.

Although the defendant was 41 years of age, Detective O'Neil decided to use fillers whose ages ranged from 26 to 29, since he reasoned that the age difference was not significant, when it was considered with such facts as that some of the victims of the Central Park robberies had indicated that the perpetrator's age was "anywhere between twenty five and forty", and that Detective O'Neil believed that defendant

"looks very young for his age". Further, Detective O'Neil testified that, while defendant appears to be a black Hispanic, he used fillers who did not have Latino-sounding names, since the appearances of those fillers indicated "they could be black Hispanic or black.", and "if I [Detective O'Neil] didn't know Antonio Gonzalez's [defendant's] name I would think he's a black man myself".

Before victims were allowed to view this six-person lineup, Detective O'Neil testified that the defendant was given his choice of number and where he wanted to sit. Defendant selected number five and decided to sit between fillers numbered four and six.

Detective O'Neil stated that three Central Park victims who examined the lineup were Ms. Janet McLean, Mr. James Trahey, and Ms. Lena Dickerson. While Ms. McLean and Mr. Trahey identified defendant as the robber, Ms. Dickerson informed Detective O'Neil "that the person that looked most like the person that committed the robbery in Central Park * * * was the person in the number five position, but * * * [s]he said number six also looked similar * * * but she couldn't be one hundred percent positive between five and six".

Ms. McLean testified at the hearing, as follows:

After having been a school teacher in London, England, for 19 years, between 1987 and 1989, she taught mathematics at the Spence School for Girls, located in New York County.

On October 21, 1988, at approximately 2:00 P.M., Ms. McLean was walking through Central Park, in the vicinity of Central Park West and 85th Street, when she first saw the perpetrator walking ahead of her. She testified that, about a minute later, he turned around and walked back toward her, carrying a gun which "was silver and it had [a] black part underneath * * * I can remember staring at it fixedly for a few * * * moments".

According to Ms. McLean, as soon as the perpetrator came close to her, he demanded money, and she replied she had none. Although she gave him a solid gold bracelet, worth about $400, the perpetrator "still asked for money and pulled my brief case and I screamed, I had no money. Then he walked away". Further, Ms. McLean stated that, although there was a "light rain", the rain did not interfere with her observation of the perpetrator, since, during "eighty percent" of their approximately four-minute encounter, the perpetrator was as close to her as "[a]bout two or three feet".

She testified that on the day of the crime, the perpetrator "was wearing blue jeans and a leather jacket, a brownie [sic] tan color, and I think the baseball cap was black but I'm not a hundred percent sure about that. He was very thin [and] I think [he was wearing an] open necked tennis shirt or shorts shirt". While she is five foot six inches tall, the perpetrator "seemed taller," approximately "five foot nine, ten eight," since "[w]e were standing on a slight incline and he was slightly above me".

As a teacher, Ms. McLean was "used to looking at faces," and so "I took in his face", noting that the perpetrator had "black skin", with "sunken cheeks," which were "pitted I think with stubble". In addition, she testified that the color of the perpetrator's eyes seemed to be "dark brown", the color of the sides of his hair, not hidden by the baseball cap, "was dark but slightly grizzled", and she estimated that his age "was about forty years".

Almost three weeks after the robbery, pursuant to police request, on the evening of November 11, 1988, she went, accompanied by her husband, to the offices of the Manhattan Robbery Squad, in order to view a lineup.

Before Detective O'Neil took her inside the viewing room, he cautioned her "to take my time and I would have to say exactly what I felt, whether I saw the person with whom I had the incident or whether I didn't".

Subsequently, she looked through the window of the viewing room at the six men in the lineup, and Ms. McLean testified that "I didn't like the idea of picking somebody out [and] the person I'd seen in the park had been wearing a cap. I wanted to see him wearing a cap". She asked the detectives to have all of the men in the lineup put on caps, and the detectives asked her to step away from the window. When she again looked through that window, and saw those men with caps on, "[i]t just confirmed for me that it was number five". Even though, as mentioned *supra,* there was a difference in age between number five and the other five men in the lineup, Ms. McLean testified that, when she made the identification of defendant, "I wasn't thinking about age," since number five "looked like the person I met in the park". As mentioned *supra,* number five was the defendant's number.

The defense did not present any witnesses at the hearing.

Subsequent to the receipt of the evidence, Criminal Term found that the arrest of defendant for the robbery of Ms. Rivel

in Inwood Park on November 10, 1988, discussed *supra,* was based upon probable cause. Further, Criminal Term found the People's hearing witnesses to be credible.

Specifically, as to the second lineup, Criminal Term found it to be neither suggestive nor violative of the defendant's right to "due process", since Detective O'Neil followed correct procedures in assembling that lineup, and "[t]here is no Constitutional requirement that a defendant in a line-up must be surrounded by people nearly identical in appearance". We have stated "that much weight is to be accorded the determination of the suppression court with its peculiar advantage of having seen and heard the witnesses *(People v Prochilo,* 41 NY2d 759, 761)" *(People v Cruz,* 158 AD2d 293 [1st Dept 1990], *lv denied* 76 NY2d 733 [1990]).

Shortly before the trial was to begin, defendant, after consulting with counsel, pleaded guilty to committing the crime of robbery in the first degree (four counts), in full satisfaction of the 20-count indictment, number 10424 of 1988, and of the five-count indictment, number 4885 of 1989. He pleaded guilty to two first degree robbery counts under each indictment.

Thereafter, On October 17, 1989, defendant was sentenced, as a predicate felon, to indeterminate concurrent prison terms of from 7 to 14 years on two counts contained in indictment number 10424, and from 6 to 12 years on two counts contained in indictment number 4885, with the latter sentence to run consecutively to the first sentence. Pursuant to that judgment, defendant is currently incarcerated.

On appeal, the defendant's first contention is that the second lineup was improperly suggestive, since allegedly race and age differences between the defendant and the fillers "combined to focus undue attention on him in the lineup".

In *People v Chipp* (75 NY2d 327, 335 [1990], *cert denied* — US —, 111 S Ct 99 [1990]), the Court of Appeals stated: "It is firmly established in our jurisprudence that unduly suggestive pretrial identification procedures violate due process and therefore are not admissible to determine the guilt or innocence of an accused *(United States v Wade,* 388 US 218 * * * *People v Blake,* 35 NY2d 331; *People v Riley,* 70 NY2d 523; *People v Adams,* 53 NY2d 241). We have held that '[s]howup identifications, by their nature [are] suggestive [and] are strongly disfavored' *(People v Riley, supra,* at 529). By contrast corporeal lineups, properly conducted, generally provide a reliable pretrial identification procedure and are properly

admitted unless it is shown that some undue suggestiveness attached to the procedure. While the People have the initial burden of going forward to establish the reasonableness of the police conduct and the lack of any undue suggestiveness in a pretrial identification procedure, it is the defendant who bears the ultimate burden of proving that the procedure was unduly suggestive *(People v Berrios,* 28 NY2d 361)".

■ The fundamental "issue involved in ascertaining the validity of a lineup identification concerns 'undue suggestiveness' which is determined by considering the totality of the circumstances surrounding the lineup" *(People v Rodriguez,* 124 AD2d 611, 612 [1986]; *People v McClarin,* 157 AD2d 747, 748 [1990], *lv denied* 75 NY2d 921 [1990]).

It is well-established law that "[t]here is no requirement * * * that a defendant in a lineup be surrounded by people nearly identical in appearance *(People v Mason,* 138 AD2d 411, 412; *People v Collins,* 136 AD2d 720, 721)" *(People v Chipp, supra,* at 336).

When a court evaluates the fairness of a lineup, some of the factors to be considered are physical characteristics of the subject such as skin color, height, weight, clothing, hairstyle, age, and whether the subject is clean-shaven or has facial hair.

Differences between a defendant and the fillers do not make a lineup suggestive, unless those differences were highlighted in the description by the victims of the perpetrator. For example:

We have held that a lineup was not unduly suggestive simply because the defendant was heavier and taller than the fillers, since those fillers "were reasonably similar to defendant *(People v Wiley,* 137 AD2d 735, *lv denied* 71 NY2d 1035), and the victim made her identification only after the [fillers] and defendant were directed to make a demand for money. Clearly, defendant's girth and height did not single him out from the other participants" *(People v Adams,* 167 AD2d 160, 160-161 [1st Dept 1990], *lv denied* 76 NY2d 1019 [1990]).

The Appellate Division has held a lineup not improperly suggestive, where "[a]n examination of the lineup photograph leads us to agree with the hearing court's finding that, while two of the subjects appeared to be in their mid-twenties and three of the subjects appeared to be in their late teens or early twenties, defendant appeared older than his stated age of 17 and that the lineup therefore constituted a 'fairly

representative panel'. Thus, we find that the age disparity in this case did not present a substantial risk of misidentification" *(People v Gairy,* 116 AD2d 733 [1986], *lv denied* 67 NY2d 942 [1986]).

Our examination of the photographs of the subject second lineup of Detective O'Neil indicates many similarities between the defendant and the fillers, in that every participant had dark skin, had dark short head hair, all appeared slimly built, and height differences were minimized by having them seated.

In view of the fact that, as discussed *supra,* the Central Park victims were not agreed on either the perpetrator's race or age, in that "[s]ome indicated it was black, some indicated it was a Hispanic", and some of the victims indicated that the perpetrator's age was "anywhere between twenty five and forty", we do not find that Detective O'Neil's use of dark-skinned fillers whose ages were between 26 and 29 made that lineup unduly suggestive, since neither the perpetrator's race or age were highlighted in those victims' descriptions. Further, we find that this lineup did not create "a substantial likelihood of irreparable misidentification. The fill-ins for the lineup were sufficiently similar in appearance to the defendant such that the viewer would not have been oriented toward selecting the defendant as a participant in the crimes charged" *(People v Collins,* 136 AD2d 720, 721 [1988], *supra, lv denied* 71 NY2d 894 [1988]).

Ms. McLean, who had a four-minute encounter with defendant, while he pointed a gun at her, testified, as discussed *supra,* that she was "used to looking at faces," and so "I took in his face", noting that the perpetrator had "black skin", was wearing a baseball cap, and "was about forty years" of age. Although Ms. McLean testified that the five fillers in the lineup photograph appeared to be in their "twenties to thirties", while the defendant appeared to be "in his forties", she noted that her lineup identification was not based upon age. Further, she testified all of the participants were black, and of the same general size.

After our examination of Ms. McLean's testimony we find that the most significant factor in her identification of defendant as the perpetrator was neither race nor age, but the fact that she would not make an identification until, at her request, the detectives had the men in the lineup put on baseball caps. She then selected the defendant, since "[i]t just confirmed for me that it was number five".

Considering the above analysis of Ms. McLean's identification of defendant as the perpetrator we find that plainly the age and race of the defendant "did not single him out from the other participants" *(People v Adams, supra,* at 161).

Detective O'Neil testified, as discussed *supra,* that the same night, another victim, Mr. Trahey, identified defendant from the lineup.

On November 5, 1988, at about 12:30 P.M., while Mr. Trahey and Ms. Dickerson were birdwatching in Central Park, a perpetrator used a gun to rob them both.

We find further support for the conclusion that the lineup was not unduly suggestive from the fact that Ms. Dickerson could not make a positive identification since, in pertinent part, Detective O'Neil testified that Ms. Dickerson informed him "that the person who looked most like the person that committed the robbery in Central Park * * * was the person in the number five position [defendant's number], but * * * [s]he said number six also looked similar * * * but she couldn't be one hundred percent positive between five and six".

In conclusion, based upon the record herein, and our examination of the photographs of the lineup, we find that "the hearing court properly concluded that under the totality of the circumstances the pretrial lineup conducted at bar was not unduly suggestive" *(People v Diaz,* 138 AD2d 728 [1988]).

■ Finally, defendant contends, in substance, that judgment should be reversed and leave granted to withdraw the plea, on the ground that Criminal Term allegedly coerced him to plead guilty, by threatening to sentence defendant to "a much higher" sentence, if he proceeded to trial and was convicted. Since defendant neither moved to withdraw his plea before sentencing, nor raised that issue in a motion, pursuant to CPL 440.10, to vacate judgment, he has failed to preserve that claim for appellate review *(People v Lopez,* 71 NY2d 662 [1988]).

Further, our examination of the record indicates no reason for us to review the issues in the interest of justice, since we find that this "defendant's plea of guilty was freely, voluntarily and knowingly given" *(People v Cummings,* 106 AD2d 294 [1st Dept 1984]).

Accordingly, judgment, Supreme Court, New York County (Jerome Hornblass, J.), entered October 17, 1989, convicting him, upon his plea of guilty, of the crime of robbery in the

first degree (Penal Law § 160.15 [four counts], and sentencing him, as a predicate felony offender, to two indeterminate concurrent prison terms of from 7 to 14 years for the two robbery counts contained in indictment number 10424/88, and to two indeterminate concurrent prison terms of from 6 to 12 years for the two robbery counts contained in indictment number 4885/89, and the latter sentence is to be served consecutively to the first, is affirmed.

CARRO, J. P., ELLERIN, WALLACH and RUBIN, JJ., concur.

Judgment, Supreme Court, New York County, rendered on October 17, 1989, is affirmed.