OPINION OF THE COURT
Gustin L. Reichbach, J.
Background
This court is again confronted with the recurring aporia in New York identification law regarding evidence of pretrial identifications. New York law has been interpreted as prohibiting trial testimony about a previous identification in an excellent photo array, yet has a more expansive approach in admitting testimony of pretrial identifications in less than compelling corporeal lineups.
In recognition of the burden on law enforcement to find stand-ins with physical features approximating those of a suspect, courts have approved what otherwise might have been suggestive lineups (People v Tatum, 129 Misc 2d 196, 204 [1985], citing Sobel, Eyewitness Identification, at 10-7 [1984]; United States v Barron, 575 F2d 752 [9th Cir 1978]). Nevertheless, the court in Tatum (supra) suppressed a lineup identification as unduly suggestive where the defendant was the only one in the lineup with a glass eye.
The dilemma is brought into sharp relief where, as here, a very visibly distinctive individual is first identified in a photo array with five others who share these distinctive characteristics and then is subsequently identified in a corporeal lineup where the five fillers share none of the defendant’s distinctive characteristics.[1] As this court has previously noted, almost 40 years ago, in its seminal case, United States v Wade (388 US 218 [1967]), the United States Supreme Court discussed the critical *205 importance of fair identification procedures and noted “the high incidence of miscarriage of justice from mistaken identification.” (Id. at 228.) Indeed, it has long been axiomatic in the criminal justice system that misidentification is the single greatest source of wrongful convictions, responsible for more wrongful convictions than all other causes combined. (See, Wells et al., Eyewitness Identification Procedures: Recommendations for Lineups and Photospreads, 22 L & Hum Behav [No. 6], at 1 [1998].) Dramatic scientific evidence confirming the scope of this problem has been provided by postconviction DNA exonerations. Since 1992, the Innocence Project, formerly associated with the Benjamin N. Cardozo School of Law, has noted the release of 153 prisoners, including 14 on death row, as a consequence of demonstrating a convicted suspect’s actual innocence through DNA evidence. In over 80% of these 153 cases, the defendants were convicted due to (mis)identification testimony. (See, <http://www.innocenceproject.com/causes/mistakenid.php>, cached at <http://www.courts.state.ny.us/reporter/webdocs/ Mistaken_I_D.htm>.)
Wade (supra) and its immediate progeny focused on blatantly suggestive identification procedures. (Manson v Brathwaite, 432 US 98 [1977]; Simmons v United States, 390 US 377 [1968].) As New York developed its own jurisprudence, our courts incorporated the concerns and rationale of many of these United States Supreme Court decisions. Identification procedures were held to be violative of due process because of police suggestion as to whom the perpetrator was (People v Riley, 70 NY2d 523 [1987] [police station showup suggestive as a matter of law]), or where a particular characteristic of one person in an array drew the viewer’s attention (People v Shea, 54 AD2d 722 [2d Dept 1976] [only suspect with blond “afro”]), or where police exhibited a single photograph of the suspect to a witness (People v Osgood, 89 AD2d 76 [2d Dept 1982]), or where the suspect was dramatically different in appearance from others in the lineup (People v Milligan, 309 AD2d 950 [2d Dept 2003]).
For decades courts held that questions regarding the accuracy and believability of an identification were within the province of a lay jury to determine and, accordingly, jurors did not need, nor would it be appropriate to provide them with the benefit of expert testimony in exercising their capacity to evaluate the accuracy of an identification. (See e.g., People v Valentine, 53 AD2d 832 [1st Dept 1976].)
In the past 30 years there has been an explosion of social science research on the issue of identification and misidentifica *206 tion as well as investigating and testing procedures to improve fairness and accuracy. (See generally, Lindsay and Wells, Improving Eyewitness Identifications from Lineups: Simultaneous versus Sequential Lineup Presentation, 70 J Applied Psychol 556 [1985]; Wells, Ferguson and Lindsay, The Tractability of Eyewitness Confidence and Its Implication for Triers of Fact, 66 J Applied Psychol 688 [1981]; E.F. Loftus, Eyewitness Testimony [Harv Univ Press 1996]; Yarmey et al., Accuracy of Eyewitness Identifications in Showups and Lineups, 20 L & Hum Behav [No. 4], at 459 [1996]; Wells et al., Eyewitness Identification Procedures: Recommendations for Lineups and Photospreads, 22 L & Hum Behav [No. 6], at 1 [1998]; see also, Note, Did Your Eyes Deceive You? Expert Psychological Testimony on the Unreliability of Eyewitness Identification, 29 Stan L Rev 969 [1977]; Levine and Tapp, The Psychology of Criminal Identification: The Gap From Wade to Kirby, 121 U Pa L Rev 1079 [1973].)
It is not unusual for eyewitness testimony to be the only testimony against an accused. It is invariably very dramatic and often highly persuasive when a witness, with certainty and without equivocation, testifies that the defendant is the perpetrator and that the defendant’s face was one the witness would never forget. And yet, recent cases as well as social science research make clear, certainty is no guarantor of, and indeed, appears to be uncorrelated to accuracy. (People v Mooney, 76 NY2d 827, 832 [1990, Kaye, J., dissenting]; People v Smith [Champagne], 2 Misc 3d 1007[A], 2004 NY Slip Op 50172[U] [Sup Ct, NY County 2004]; Wells et al., Eyewitness Identification Procedures: Recommendations for Lineups and Photo-spreads, supra at 14.)
In the last few years, based on mounting and impressive social science data, there has been renewed examination and concern regarding the fairness and accuracy in what has become routine identification practice. This research played a critical role in the groundbreaking 2001 decision of the New York Court of Appeals in the case of People v Lee (96 NY2d 157 [2001]). In Lee (supra), the Court revisited and resolved the question of the admissibility of expert testimony in connection with the issue of identification, which Judge Kaye had favored in her now prescient dissent in People v Mooney (supra), 11 years earlier. In Lee (supra), the Court opened the door, in appropriate cases, to the introduction of expert testimony to assist the trier of fact in evaluating problems with and the accuracy of identification testimony.
In the aftermath of Lee, trial courts have issued a wide range of opinions discussing the significance of this social science *207 research and focusing on specific identification procedures that may produce fewer false positives. The courts have grappled with the issue of whether they should insist that the police adopt them. (People v Santiago [Edwin], 1 Misc 3d 910[A], 2004 NY Slip Op 50015[U] [Sup Ct, NY County 2004]; People v Wilson, 191 Misc 2d 224 [Sup Ct, Kings County 2002]; People v Alcime, 2002 NY Slip Op 40021[U] [Sup Ct, Kings County 2002]; Matter of Thomas, 189 Misc 2d 487 [Sup Ct, Kings County 2001].)
Two basic changes sought in traditional identification procedures are to require sequential lineups and double-blind lineups. Sequential lineups involve showing the witness the suspect and other fillers in the identification procedure one at a time, rather than the traditional practice of simultaneous presentation. There is some data to support the view that when six suspects are shown together there is a tendency by a witness to pick the one who appears most similar to his visual impression of the perpetrator, whereas this tension is minimized when the lineup participants are exhibited one at a time. (See, Wells, What Do We Know About Eyewitness Identification?, 48 Am Psychol 553, 561 [1993].) The other suggestion is the use of double-blind lineups, where the officer conducting the lineup has not been involved in the investigation and does not know who the target is. It is argued this practice reduces the possibility of the witness receiving even subtle or unconscious suggestions by the case officer to select a particular individual. (People v Wilson, supra)
The court has observed that, in recent times, at least in homicide cases, the police in Brooklyn were utilizing the double-blind procedure by using a detective from another squad, unconnected with the case under investigation, to conduct the lineup. Unfortunately, in this court’s view, that practice has apparently now been discontinued.[2]
*208 The Hearings
On December 15, 2004, the court conducted a Wade hearing in this case. (See, People v Adams, 53 NY2d 241 [1981].) Evaluating the credible evidence at the hearing, the following facts have been established. Detective John Polacsek, on October 4, 2003, was assigned to investigate the shooting and the resulting death of Curtis Cummings. Detective Polacsek had a peculiar affect during the hearing. He displayed very little independent recollection of the facts contained within his own case file. He frequently displayed a distracted, unattentive manner when queried by the court. Notwithstanding this, much of his testimony is not in dispute.
After receiving information suggesting that the defendant was a suspect in the shooting under investigation,[3] Detective Polacsek’s partner, Detective Jimenez, created a photo array including five additional pictures containing characteristics and features very similar to those of the defendant.
Typically, the PINS computer is used to produce additional photographs for the purpose of creating an array. Based on an existing database of characteristics stored in the computer, the computer can be directed to run a match. Alternatively, the computer can be programmed by inputting specific characteristics, such as age, race, weight, skin tone, and the like to produce pictures of persons with a similar appearance, based on the manually inputted information. In this case, the detective testified that his partner created the photo array by personally scrolling through the computer and selecting additional photographs. The photo arrays created, People’s 2 and 5 in evidence at the hearing, demonstrate that Detective Jimenez had a keen eye.
 Two purported eyewitnesses, identified at the hearing as witnesses No. 3 and 4, were separately shown the photo arrays, and subsequently viewed, on separate occasions, two different corporeal lineups. Witness No. 3 had described the perpetrator, prior to any identification procedures, as a tall male “Rasta” about 37 years old. Witness No. 4 provided no physical description, but did give the perpetrator’s nickname (“Dred”). The defendant in this case was 34 years of age at the time of his arrest. The defendant is 6 feet 5 inches tall, weighs 195 pounds *209 and has dramatically long flowing dreadlocks and dark long, heavy facial hair, both mustache and full beard. The arrays contained photos of five other fillers who were strikingly similar to the defendant in appearance. All had long flamboyantly dreadlocked or braided hair; all appeared of similar age, bone structure, skin tone; all had dark prominent facial hair, both mustaches and beards. In short, a remarkably fair and representative array.
Witnesses No. 3 and 4 both selected the defendant as the perpetrator from the photo arrays. Based upon that identification, the defendant was taken into custody at his previous home at 2:30 p.m. on October 10, 2003. It is clear that once these two eyewitnesses had identified the defendant as the perpetrator, the police had probable cause to arrest him. (People v Day, 8 AD3d 495 [2d Dept 2004]; People v Walton, 309 AD2d 956 [2d Dept 2003].)
In the past five years this court has conducted between 50 and 100 Wade hearings, the majority in homicide cases. The procedures employed by the police in this case are entirely typical. At the hearing, Detective Polacsek indicated that it was police procedure to conduct a corporeal lineup “right away,” as soon as the defendant was in custody. The detective testified at length and in detail about the procedures he employed in assembling fillers.
The unfortunate consequence of this practice is for the police to press forward with a lineup, often with undue haste, and attempt to assemble five other persons similar to the defendant for the corporeal identification procedure. In most instances, the police resort, as they did here, to the nearest homeless shelter. (TR at 86.)[4]
While adamant that it was police procedure to conduct the lineup as soon as a suspect is in custody, the officer was unable to furnish the court with any rationale for this policy. The prevalent practice, as here, is to postpone the formal arrest procedure until an identification is made in the corporeal lineup, although there is no legal requirement to do so. Once an eyewitness to a crime selects a suspect from a photo array and identifies him as the perpetrator, the police have probable cause to arrest the defendant. There is no legal reason to delay a formal arrest. (Walton, supra.) There is no legal impediment *210 and, indeed, a lineup conducted after the defendant has been formally arrested is permitted under CPL 240.40 (2) (b) (i). It would appear that the decision to postpone formal arrest until the corporeal lineup is completed, as previously testified to before this court (see, People v Burrowes, supra), is for the convenience of avoiding the additional paperwork and the trip to Hikers Island required by a takeout order.[5]
Witness No. 4 viewed a corporeal lineup (hereafter, lineup No. 1) on October 10, 2003 at about 9:00 p.m. In that lineup, witness No. 4 identified the defendant as the shooter. Notwithstanding this identification, the police continued to delay the formal arrest process, instead holding the defendant at the precinct for an additional 24 hours in order to hold a second corporeal lineup (hereafter, lineup No. 2) for witness No. 3 because witness No. 3 was not available on the evening of the 10th.[6] The detective indicated that witness No. 3 was cooperative and that he was *211 “confident” he would come to the precinct as needed. (TR at 90.)
The detective indicated that the homeless shelter is the preferred spot to gather fillers because people there are more likely to participate because they are paid a small fee ($10). (TR at 87.) The selection of matches is left to the discretion of the case detective who eyeballs potential candidates and attempts to select the closest match. As previously noted, the defendant in this case was 6 feet 5 inches with very distinctive hair and full facial hair characteristic of the Rastafarian tradition. The detective acknowledged that it’s very difficult to find anyone as tall as the defendant (6 feet 5 inches). (TR at 88.) He further acknowledged that he couldn’t get anyone with long “dreads” like the defendant to come to the precinct for the second lineup. (TR at 85.)
Convenience is of course an insufficient basis upon which to jeopardize a defendant’s right to a nonsuggestive identification procedure. Notwithstanding the defendant’s distinguishing features, lineup No. 1 demonstrates that suitable fillers could be found to participate in a fair array. It appears that an ill-founded and unjustifiable sense of urgency to conduct a second lineup resulted in the flawed lineup No. 2, a result that could have been avoided had a more measured approach been employed involving locating appropriate fillers first and then procuring the defendant for a lineup instead of the inverted approach employed here.
As is the practice, both lineups, when ultimately assembled, were memorialized in a series of poor quality Polaroid pictures *212 admitted, into evidence as People’s exhibits 3 A and B and 4 A and B.[7]
In conducting both corporeal lineups, the police attempted to minimize height discrepancies by having all participants sit. To minimize the highly distinctive hairstyle of the defendant, the police had all participants wear baseball caps. This effort was not successful since defendant’s long dreads were visible, the cap on his head notwithstanding. This problem was not a serious concern in lineup No. 1 since defendant was in position number 3 and fillers 1, 2 and 4 had similarly long braided hair visible under their hats.
Lineup No. 2 however presents very serious problems. The fillers in that lineup were also obtained by Detective Polacsek but the actual lineup was conducted by Detective Wallen,[8] who viewed the lineup from the same perspective as the identifying witness (witness No. 3). Detective Wallen who had conducted “a lot of lineups” (TR at 124) was a candid, direct and entirely credible witness. He readily acknowledged that the defendant had a distinctive hairstyle (TR at 125) and that as he viewed lineup No. 2 he noticed nobody else in that lineup with a similarly distinctive hairstyle. (TR at 125.) He also acknowledged that as he viewed this lineup, the defendant “had a fairly distinctive and heavy beard” (TR at 125) and that nobody else in the lineup he viewed had a similar heavy or distinctive beard. (TR at 126.)[9] Furthermore, notwithstanding the seated position of all participants, the defendant, at 6 feet 5 inches, was markedly taller than all the others in the lineup, who were all 5 feet *213 10 inches or 5 feet 11 inches, more than half a foot shorter than the defendant.[10]
This is not a question of bad faith. This court has observed, almost without exception, that officers conducting lineups make every effort to be fair and that is true in this case as well. But, as Detective Polacsek acknowledged, when quickly putting together a lineup it is very difficult to find someone that tall (TR at 88). And further, that second evening he couldn’t get anyone with a hairstyle similar to defendant’s to come to the precinct.
Detective Polacsek reluctantly acknowledged that it was a possibility that if he had more time to put together the lineup, he could have found people with dreads to participate. (TR at 89.) While it is true that there was no proverbial neon arrow blinking over the defendant’s head, he is substantially taller than everyone else in the lineup by more than half a foot. The defendant was the only one with visible long hair and full heavy facial hair.
As previously noted, in recognition of the practical difficulties in assembling five lineup fillers, the courts have often taken an expansive view of what constitutes a fair procedure. The courts have made it clear that there is no obligation to provide fillers extremely close in appearance to the suspect, but instead, the test seems to be a rather gross one: whether the defendant is specifically and uniquely highlighted. (See e.g. People v Snyder, 304 AD2d 776 [2d Dept 2003] [defendant argued that lineup should be suppressed due to differences in height, age, and weight of fillers but court found lineup was not unduly suggestive]; People v Harris, 187 AD2d 530 [2d Dept 1992] [Court held lineup was not suggestive even though fillers were taller and heavier than defendant]; People v Floyd, 173 AD2d 211 [1st Dept 1991] [lineup not rendered suggestive because the victim recognized two of the fillers and because a third filler was substantially heavier than the others]; People v Green, 159 AD2d 325 [1st Dept 1990] [lineup not unnecessarily suggestive when defendant was only participant wearing a bandage on his head]; People v Chipp, 75 NY2d 327 [1990] [differences in skin tone of three of the fillers did not create a substantial likelihood that defendant would be singled out]; People v Gega, 188 AD2d 305 [1st Dept 1992] [lineup not suggestive where defendant was *214 wearing same leather jacket as worn during commission of crime and which had been described by witness].)
The People argue that by these standards the detective did the best he could in selecting fillers at the shelter because there was nobody defendant’s height or with dreads available that night and therefore witness No. 3 should be permitted to testify to his lineup identification.
Both witnesses gave descriptions, which made clear reference to defendant’s distinctive hairstyle (one referred to “Rasta,” the other to “Dred”). Both saw eminently fair photo arrays where all the persons displayed had flamboyantly visible hairdos.
The courts have not hesitated to find lineups unduly suggestive where, as here, there are obvious differences between the defendant and the other fillers including where their description references a distinctive hairstyle. (People v Carolina, 184 AD2d 520, 520-521 [2d Dept 1992] [defendant only one with “flattop”]; People v Moore, 143 AD2d 1056 [2d Dept 1988] [lineup suppressed, defendant only person in lineup with braids]; People v Adams, 90 AD2d 1 [1st Dept 1982] [lineup would be suggestive if defendant was the only one with red hair]; People v Breitenbach, 260 AD2d 389 [2d Dept 1999] [lineup unduly suggestive where defendant was the only blond in lineup].)
There is a line of cases where the courts have held that a distinctive hairstyle does not render a lineup unduly suggestive, but in those cases the courts found the police had concealed the distinctive hair by having the lineup participants wear caps or were positioned in such a way where the hair is not visible. (People v Meatley, 162 AD2d 721 [2d Dept 1990]; People v Stephens, 143 AD2d 692 [2d Dept 1988]; People v Walker, 215 AD2d 606 [2d Dept 1995]; People v Mena, 287 AD2d 394 [1st Dept 2001].) In this case the use of caps did not hide the fact that defendant’s hairstyle, markedly different from the fillers, was readily visible.
Further, those cases in which the court has found that a defendant’s visible and distinguishing hairstyle or distinctive clothing did not render the lineup unduly suggestive involved factual circumstances where the defendant’s hairstyle or clothing did not figure prominently in the witnesses’ description of the perpetrator. (People v Simmons, 158 AD2d 950 [4th Dept 1990]; People v Gaston, 270 AD2d 22 [1st Dept 2000]; People v Stephens, supra; People v Saunders, 306 AD2d 502 [2d Dept *215 2003].) Here, of course, the witness had told the police that the defendant was known as “Dred,” a direct reference to his Rastafarian hairstyle. Thus, the defendant’s hairstyle, visibly different than all the other fillers, was specifically highlighted in the witnesses’ description. (People v Gonzalez, 173 AD2d 48 [1st Dept 1991].)
The court has before it a pair of photo arrays in which the five fillers are remarkably close in appearance to the suspect. The eyewitnesses identified the defendant in these excellent photo arrays, and yet, under existing case law, these identifications cannot be admitted. If, as the great Justice Holmes wrote in The Common Law (Little, Brown [1984]), “The life of the law . . . has been experience,” then experience suggests that the time has come, in light of evolving social practices and technological advances, to reconsider past practices and current legal doctrine which would exclude an identification from a remarkably fair photo array while admitting an identification from a flawed if arguably adequate corporeal lineup.
History of the Prohibition of Admissibility of Photographic Identification
Historically, under the theory that such testimony was improper bolstering, witnesses were prohibited from testifying at trials that they had made a prior out-of-court identification of the defendant. (See, People v Jung Hing, 212 NY 393 [1914] [lineup]; People v De Martini, 213 NY 203 [1914] [police officer detailed prior lineup identification to impeach witnesses who failed to confirm such an identification on the stand].)
In 1927, the 1881 Code of Criminal Procedure was amended to permit testimony of a prior identification. (Code Grim Pro § 393b, as added by L 1927, ch 336.) That this was the object of the amendment was made clear from a letter of support from the Committee on Criminal Courts Law and Procedure of the Association of the Bar of New York which stated: “The object of this bill is to supercede certain decisions which have held, in effect, that such testimony is an improper bolstering of a witness.” Section 393b of the Code of Criminal Procedure provided that “[w]hen identification of any person is in issue, a witness who has on a previous occasion identified such person may testify to such previous identification.” (Emphasis added.)
The critical phrase “identified such person” was never specifically defined in the statute nor is it revealed in the legislative history. However, in People v Hagedorny (272 App Div 830 [2d *216 Dept 1947]), the Court determined that a previous identification of the defendant in a photograph did not constitute identification of “such person” under the statute. Thus, preclusion of photographic identification was based on the Court’s construction of the term “such person.” This interpretation was affirmed by the Court of Appeals in People v Cioffi (1 NY2d 70, 73 [1956]), which, citing Hagedorny (supra), held that “[testimony to prior identification from pictures has been held not to be admissible under section 393-b.”
People v Caserta (19 NY2d 18, 21 [1966]) made it plain that it viewed the language “such person” as permitting evidence of a prior identification “of the defendant in the flesh.” In Casería (at 21), the Court explained its view of why photographic identification was not permitted under the statute and provided two rationales for such exclusion. The Court found that “not only is it readily possible to distort pictures as affecting identity, but also where the identification is from photographs in the rogues’ gallery . . . the inference to the jury is obvious that the person has been in trouble with the law before.” (Id.)
CPL 60.25 was passed into law in 1970 as part of a broad-based overhaul of the New York Code of Criminal Procedure (L 1970, ch 996, § 1). It was amended once in 1977 (L 1977, ch 479, § 1). There is little record of any discussion of the use of photographs in the materials accompanying the 1970 bill.
The courts continued to interpret the revised statute in the same way as before, excluding prior identification by photograph. (See People v Griffin, 29 NY2d 91 [1971]; People v Lindsay, 42 NY2d 9 [1977].) Section 60.25 (1) (a) (ii) provides that a witness may testify to a subsequent identification of “o person whom he recognized as the same person.” (Emphasis added.) Materials accompanying the 1977 amendment (a number of letters found in the Bill Jacket) use the term “in-person” identification. Yet the term adopted in the bill was not “in-person” but rather “a person.”
As noted, nearly 40 years ago, the Court of Appeals in Caserta (supra) expressed its concern that photographs were subject to distortion and manipulation and, further, that by permitting the jury to hear that the police were in possession of the defendant’s photographs, they would likely conclude that the defendant had a prior police record, resulting in severe prejudice to the defendant. In the intervening years, technological advances have not only made photographs unfailingly accurate, but advances in computer technology, barely in its infancy in *217 1971, when Griffin (supra) was decided, have reached a level of speed and sophistication so as to permit the rapid search of enormous data banks and the generation of photographs of striking similarity to the suspect. This is in sharp contrast to the hit or miss possibilities of hastily assembled corporeal lineups.[11]
While it is true that new technology has made photo imaging easier to manipulate, this court fails to appreciate the precise concern regarding photographic distortion. Photographic arrays shown to witnesses must be preserved and a failure to do so raises an inference that the array was impermissibly suggestive and may result in the suppression of any resulting identification. (See, People v Galletti, 239 AD2d 598 [2d Dept 1997]; People v Wedgeworth, 156 AD2d 529 [2d Dept 1989]; People v Bratton, 133 AD2d 408 [2d Dept 1987].) While this court is not prepared to indulge the belief that willful manipulation on the part of the police is a realistic concern, attempts at such manipulation will be readily revealed by the preserved array.
The more compelling concern was that juries will speculate, with substantial prejudice to the defendant, how the police came to be in possession of defendant’s photograph, and might draw the inference that the defendant has a prior police record.
While very sensitive to this concern, this court believes that today such inferences are no longer likely to be drawn, and can, in any event, be effectively eliminated by giving an appropriate instruction.
In 1971, when the Court of Appeals last discussed this problem in People v Griffin (supra), other than passports, there were limited circumstances in which the government, and, in particular, local police, had possession of citizens’ photographs. In today’s information age, where security and other concerns routinely require photo identification cards to perform both official duties and many of the most ordinary tasks of everyday life, there are countless ways in which government has ready access to people’s photographs.
To be a licensed driver in New York a photograph must be on record with the Department of Motor Vehicles. Welfare cards carry photographs. School records contain photos, as do immigration documents. In short, photographic identification *218 documents are ubiquitous today and numerous government agencies, not just the police, have possession of or access to photographs of virtually everybody. Moreover, an appropriate limiting instruction by the court could either provide an explanation of how this defendant’s photographic image was obtained or, at the very least, direct jurors to refrain from any speculation as to how the defendant’s image was obtained.[12]
Most importantly, while these older decisions focus exclusively on the problems and resulting prejudice from the use of photographic identification procedures, given the enormous technological advances in the past three decades, the old rationales lack any offsetting discussion or analysis of the benefits now available through the use of such technology.
The court has undertaken an exhaustive review of identification procedures employed nationwide. Every other state, 49 in all, as well as the federal courts, permits evidentiary use of a prior photographic identification in a fair array. (See, Table 1 attached.)
Despite this almost universal acceptance of testimony regarding a pretrial photographic identification, New York continues to enisle itself from this modern rule. New York continues to adhere to and sanction a practice that requires a detective, with no advance preparation, to quickly go out and find by chance five live bodies that will fairly match the physical characteristics of the suspects, regardless of how distinctive a suspect may appear. To conclude that such a task can be performed spontaneously and accurately requires an optimism bordering on thaumaturgy.
Since all the component parts of our adversary system, the defense bar, the prosecution, the police, and the judiciary, share a common interest in ensuring maximum fairness in identification procedures to avoid the recurring pitfalls and injustices which flow from misidentification, there is increasing interest in employing procedures likely to yield more accurate results. The initial identification procedure involving the witness should *219 be the best and fairest possible.[13] It is essential that the fillers have similar features and characteristics. If fairly composed, there is no sound reason not to submit a photographic identification for evaluation by the finder of fact.
Suggestiveness and Independent Source
Due to the facts set forth above regarding corporeal lineup No. 2, this court finds that the defendant has sustained his burden of proving by a preponderance of the evidence that lineup No. 2 was unfair and unduly suggestive. (People v Berrios, 28 NY2d 361 [1971].) Consequently, the court will hold an independent source hearing to determine whether the eyewitnesses had an independent, untainted basis to permit them to make an in-court identification of the defendant. (People v Bouchereau, 255 AD2d 389 [2d Dept 1998].)
Conclusion
The court, now returns to the conundrum created by New York’s singular rule of excluding photographic identification. As previously noted, in recognition of the practical difficulties of finding similar fillers on short notice, the courts have adopted a forgiving standard and emphasize that the standard is not how closely other fillers look like the suspect, but rather whether the suspect stands out in any dramatic way. On the other hand, our courts have continued to exclude identifications made from photographic arrays where the fillers’ features often have a remarkable resemblance to the features of the suspect.
Recognizing that our Court of Appeals has not revisited the issue of photographic identifications in decades, and given advances in both technology and social science research, this court respectfully suggests that the time has come to reevaluate New York’s singular exception regarding photographic identification.
In this case, while witness No. 3 may not testify to his identifications of the defendant in the corporeal lineup, he may testify to the identification of the defendant in the photographic array that he viewed on October 8, 2003.
*220 The court will give the jury an appropriate limiting instruction to prohibit any speculation as to how the images in the array were obtained.
Table 1
[[Image here]]
*221 [[Image here]]
*222 [[Image here]]
*223 [[Image here]]
*224 [[Image here]]

. (See also People v Burrowes, NYLJ, Oct. 25, 2004, at 21, col 1.) In Burrowes the defendant was young (19) and slight. The photo array contained five other young men of similar appearance while in the corporeal lineup the fillers (police officers) were all substantially older and bulkier.

. All the cases in which the courts have directed that the police employ certain procedures when conducting lineups have occurred in the context of postindictment lineups in which the intervention of the court has been sought to produce a defendant for participation in an identification procedure pursuant to CPL 240.40 (2) (b) (i). No court has yet held that the failure to employ either or both sequential or double-blind lineup procedures renders the traditional identification procedure inherently suggestive or infirm. This court notes that there would be only slight inconvenience in employing sequential and double-blind procedures, and that such procedures would be even easier to employ in the context of photographic arrays.

. Detective Polacsek had shown a witness a single photo of defendant. That witness, who did not observe the shooting, identified the defendant as someone who had had an altercation with the deceased some two weeks before the shooting.

. References to “TR” refer to the transcript of the hearings conducted in this case.

. The only additional burden to conduct a lineup utilization of a “takeout order” is the defendant’s right to have counsel present at the lineup. (People v Jackson, 74 NY2d 787 [1989].)

. Because of the court’s finding that lineup No. 2 was unduly suggestive, it is not necessary to reach the troublesome issue of the prearraignment delay in this case and its consequence for the uncounseled second lineup held here. It is well established in New York that ordinarily there is no right to counsel in prearraignment corporeal viewings. (People v Blake, 35 NY2d 331 [1974]; People v Hawkins, 55 NY2d 474 [1982].) This is, in part, in recognition of the limited role that counsel plays at identification confrontations (People v Hobson, 39 NY2d 479 [1976]), when contrasted with the role of counsel during interrogations. Even in the area of statements, a delay in arraignment when a defendant has waived counsel is simply a factor to be considered in determining the voluntariness of a confession. (People v Ramos, 99 NY2d 27 [2002].) Nonetheless, where a defendant has not waived counsel, as here, an insufficiently explained delay may establish his right to counsel at the corporeal viewing. (People v Ramos, supra at 34; People v Blake, 35 NY2d 331 [1974].)
Generally, our courts have found the right to counsel at prearraignment lineup “insignificant” when balanced against the “primary policy consideration . . . that lineups ... be conducted as close in time to the occurrence of the incident” in question (People v Hawkins, supra at 486), because recollections of a witness may fade, prompt identification may diminish mistaken identification and also permit the release of an innocent suspect with a minimum of delay and further may assist the police in determining whether to continue their search of the vicinity of the crime. (See, People v Hawkins, supra; People v Blake, supra; United States v Sanchez, 422 F2d 1198 [1970].)
In this case, few of these reasons obtain. The crime here occurred on October 4, 2003, the defendant was positively identified by witnesses No. 3 and 4 in an excellent photo array on October 8th and was arrested at about 2:30 P.M. and identified by witness No. 4 at 9:00 P.M. at a corporeal lineup on October 10th. Certainly by that time the police were neither going to continue their search nor release the defendant. There was no rationale provided by the officer to- *211 hold the defendant for another 23 hours (he had hy then been in custody for some 30 hours) to do a second, ultimately flawed, corporeal lineup.
As the Court of Appeals noted in People v Blake (supra at 340), prior to filing an accusatory instrument, the presence of counsel “is not mandated, but is desirable.” The Court further determined, “Since such a rule offers opportunity for delay between arrest and the filing of an accusatory instrument, an undue delay is prima facie a suspect circumstance suggesting that the delay may have been for the purpose of depriving the accused of counsel at a viewing. In that event, the prosecution would have the burden to explain and offer proof on the pretrial identification hearing, if one is had, why the opportunity to so have counsel at the viewing was not afforded.” (Id.) And further, that if such delay was not sufficiently explained, “which prevents him from obtaining counsel as he would on arraignment, and he has not waived the right to counsel, the circumstances may establish his right to counsel at the viewing, the breach of which should result in exclusion.” (People v Blake, supra at 340-341.)

. This court has, on dozens of occasions, commented on the disgracefully poor quality of these photographs. These lineups are usually conducted in small spaces so that head on photographs can usually be taken of only three persons at a time, requiring as here two photographs to show the whole six-person lineup. Where an attempt is made to photograph the entire six, it is often done at an angle shooting down the line, which invariably obscures the features of two or more persons in the six-person lineup. In this case, the features of the person appearing at the end of each of these two lineups are very hard to distinguish.

. Detective Wallen was brought in to conduct this lineup under double-blind procedures discussed earlier.

. Detective Polacsek, who the court finds was a substantially less credible witness, testified that one other person in lineup No. 2 had “hair sticking out the back” and that another had “a little bit” of hair on his chin. (TR at 86.) The court finds that these strained attempts to show some similarity with defendant’s highly visible distinctive features are both inaccurate and disingenuous.

. In addition to having participants seated, the police often have participants sit on phone books to further minimize height discrepancies. This was not done here.

. Today inexpensive, highly sophisticated digital photography is available which easily produces photographs of immeasurably superior quality to the informal and inadequate Polaroid photographs still currently used to memorialize corporeal lineups.

. Whether or not limiting instructions are effective or, as some may fear, do more harm than good is debatable. Nevertheless our jury system operates on the principle that such limiting instructions are both followed and effective.

. Social science research makes clear that once somebody makes a positive identification, the tendency is to become committed and more certain of that identification as time goes by.