STATE OF CONNECTICUT *v.* TROY HARRIS
(AC 23328)

West, McLachlan and Peters, Js.

Argued December 5, 2003—officially released October 19, 2004

*Deborah G. Stevenson*, special public defender, for the appellant (defendant).

*Mitchell S. Brody*, senior assistant state's attorney, with whom, on the brief, were *John A. Connelly*, state's attorney, and *John Davenport*, assistant state's attorney, for the appellee (state).

*Opinion*

WEST, J. The defendant, Troy Harris, appeals from the judgment of conviction, rendered after a jury trial, of two counts of attempt to commit murder in violation of General Statutes §§ 53a-49 (a) (2) and 53a-54a (a) and one count of assault in the first degree in violation of General Statutes § 53a-59 (a) (5). The defendant claims on appeal that (1) the court improperly denied his motion for a new trial because the assistant state's attorney engaged in prosecutorial misconduct, which deprived him of a fair trial, (2) the pretrial identification procedure was unnecessarily suggestive and (3) there was insufficient evidence to support his conviction. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On May 16, 2000, John Simpson drove Howard Dozier and Hector Quinones to Washington Street in Waterbury to pick up Ray Ramos. At that time, the defendant was residing at 39 Washington Street with Tammi Jamison, the mother of his child. Simpson stopped the vehicle he was driving on Washington Street in a driveway between the defendant's house and the house where they were picking up Ramos, and all three men exited the car. Dozier walked up the street and encountered the defendant standing on his porch at 39 Washington Street. Dozier and the defendant had a brief conversation. As Dozier turned his back to the

defendant in an attempt to return to the vehicle in which he had arrived, the defendant began firing an Uzi machine gun at Dozier. Dozier ran back to the vehicle and he and Simpson drove off.[1] The defendant continued to fire at the vehicle, and Simpson, who was driving, was shot in his neck.

The defendant was tried to a jury, which found him guilty of attempting to murder Simpson and Dozier, as well as the first degree assault on Simpson.[2] The defendant received a total effective sentence of forty years imprisonment. This appeal ensued. Additional facts will be set forth as necessary.

I

The defendant first claims that because the prosecutor engaged in repeated misconduct, the court improperly denied his motion for a new trial. Specifically, he claims that the prosecutor engaged in misconduct by (1) asking the defendant to testify about the truthfulness of other witnesses and by commenting on the credibility of witnesses, (2) appealing to the emotions of the jury, (3) addressing facts not in evidence, (4) injecting personal opinion into closing argument, (5) calling for speculation and (6) implying that the defendant's failure to question certain witnesses indicated that the answers would prove his guilt. We disagree.

Before addressing the defendant's claims of prosecutorial misconduct, which were not preserved at trial, we note that our Supreme Court, in *State* v. *Stevenson*, 269 Conn. 563, 849 A.2d 626 (2004), recently enunciated a new analytic approach to reviewing such unpreserved claims. The *Stevenson* court held, inter alia, that review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d

---

[1] Quinones did not return to the vehicle and instead jumped a fence in an attempt to seek refuge from the bullets.

[2] The defendant also was charged with attempting to murder Quinones. The jury found the defendant not guilty of that charge.

823 (1989),[3] is no longer needed with respect to unpreserved claims of prosecutorial misconduct because such claims are, by their very nature, of constitutional magnitude. *State* v. *Stevenson*, supra, 574 n.11. In addition, it held that a reviewing court must apply the test set forth in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987), which, in requiring an examination of the entire trial to determine whether the defendant was deprived of a fair trial, encompasses the third and fourth prongs of *Golding. State* v. *Stevenson*, supra, 573–74.[4]

"To prove prosecutorial misconduct, the defendant must demonstrate substantial prejudice. . . . In order to demonstrate this, the defendant must establish that the trial as a whole was fundamentally unfair and that the misconduct so infected the trial with unfairness as to make the conviction a denial of due process." (Internal quotation marks omitted.) *State* v. *Ceballos*, 266 Conn. 364, 376, 832 A.2d 14 (2003).

Accordingly, claims of prosecutorial misconduct trigger a two step analytical process. "The two steps are separate and distinct: (1) whether misconduct occurred in the first instance; and (2) whether that misconduct deprived a defendant of his due process right to a fair

---

[3] "[A] defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) *State* v. *Golding*, supra, 213 Conn. 239–40.

[4] In holding that *Williams* must be applied to claims of prosecutorial misconduct, whether preserved or unpreserved, our Supreme Court noted that the absence of an objection to misconduct will be considered in determining "whether and to what extent the misconduct contributed to depriving the defendant of a fair trial and whether, therefore, reversal is warranted." *State* v. *Stevenson*, supra, 269 Conn. 576.

trial. Put differently, misconduct is misconduct, regardless of its ultimate effect on the fairness of the trial; whether that misconduct caused or contributed to a due process violation is a separate and distinct question . . . ." (Internal quotation marks omitted.) *State* v. *Stevenson*, supra, 269 Conn. 572. Once the first step is complete and misconduct has been identified, we must apply the factors set forth in *State* v. *Williams*, supra, 204 Conn. 540, to determine whether the "prosecutorial misconduct was so serious as to amount to a denial of due process . . . . Among them are the extent to which the misconduct was invited by defense conduct or argument . . . the severity of the misconduct . . . the frequency of the misconduct . . . the centrality of the misconduct to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Internal quotation marks omitted.) Id., 573.

Applying these principles, we conclude that four of the questions challenged by the defendant were improper, however, we are not persuaded that they deprived the defendant of a fair trial.

A

Misconduct

In his brief to this court, the defendant highlights fifty-six allegedly improper words, phrases and questions by the prosecutor. We agree that four of the questions asked of the defendant by the prosecutor on cross-examination were improper.

In accordance with our Supreme Court's holding in *State* v. *Singh*, 259 Conn. 693, 712, 793 A.2d 226 (2002), "a witness may not be asked to characterize another witness' testimony as a lie, mistaken or wrong." "[C]ourts have long admonished prosecutors to avoid statements to the effect that if the defendant is innocent,

the jury must conclude that witnesses have lied. . . . The reason for this restriction is that [t]his form of argument . . . involves a distortion of the government's burden of proof. . . . Moreover, like the problem inherent in asking a defendant to comment on the veracity of another witness, such arguments preclude the possibility that the witness' testimony conflicts with that of the defendant for a reason other than deceit." (Citations omitted; internal quotation marks omitted.) *State* v. *Thompson*, 266 Conn. 440, 470–71, 832 A.2d 626 (2003).

We agree with the defendant that the following two questions, asked of him by the prosecutor on cross-examination, were *Singh* violations: "Now, when [Jamison] testified, she said that you had asked her to send you letters from her to you saying you didn't do anything wrong, was she telling the truth?"[5] and "So, when [Jamison] says that you had that gun in the house and then took it from the ceiling, that isn't true?"[6]

These questions clearly asked the defendant to give his opinion as to whether Jamison's testimony was truthful. We must conclude, therefore, that these questions were improper based on the parameters set forth in *Singh*.

In addition, we conclude that the following two questions that the prosecutor asked the defendant later on

[5] "[The Prosecutor]: Now, when [Jamison] testified, she said that you had asked her to send you letters from her to you saying you didn't do anything wrong. Was she telling the truth?
"[The Defendant]: No, sir.
"[The Prosecutor]: So, you never asked her to say anything?
"[The Defendant]: No, sir. . . ."

[6] "[The Prosecutor]: So, you never owned that gun?
"[The Defendant]: I never owned that gun.
"[The Prosecutor]: You never owned that gun?
"[The Defendant]: No, sir.
"[The Prosecutor]: So, when [Jamison] says that you had that gun in the house and then took it from the ceiling, that isn't true?
"[The Defendant]: No, sir."

cross-examination were also improper: "So these people who you don't know, people you have no beef with, just . . . made this all up to get you in trouble?" and "These men came in court, sat here and said you shot at them; they made that up for no reason at all?"[7]

Taken out of context, these questions appear to inquire into the possible motives of the witnesses to be untruthful. After a careful study of the transcripts, however, we conclude that these questions were really asking the defendant *whether* the witnesses were lying; not *what their motivation* might be. We therefore conclude that these two questions were also *Singh* violations. The remainder of the challenged remarks were proper.

## B

### Due Process Analysis

We now analyze the four instances of misconduct by the prosecutor to determine whether they violated the defendant's due process right to a fair trial. Mindful

---

[7] "[The Prosecutor]: When did you know the police were looking for you?

"[The Defendant]: Like two days. It was like the 18th or 19th, somewhere around there.

"[The Prosecutor]: You knew on the 18th or 19th, but the cops found you down in New Haven on the 22nd; is that right?

"[The Defendant]: Yes, sir.

"[The Prosecutor]: Never called up [and] said, there's a big mistake, big misunderstanding. I was in Ansonia?

"[The Defendant]: I'm—how am I going to call them telling them it's a big understanding? They got a million dollar bond. It can't be too much understanding. They already got me like I'm guilty. You already got everything set up. Million dollar bond for what? I didn't do nothing.

"[The Prosecutor]: So, these people who you don't know, people you have no beef with, just walking in made this all up to get you in trouble?

"[The Defendant]: Well, from the statements they got out there they saying different stuff.

"[The Prosecutor]: These men came in court, sat here and said you shot at them. They made that up for no reason at all?

"[The Defendant]: They say a lot of things in their statement, then they turn around and say something else."

of the six *Williams* factors previously set forth, we conclude that the defendant was not deprived of a fair trial.

### 1

### Whether the Misconduct Was Invited

We first address whether the improper questions were invited by the defendant. The defendant did not put into issue the veracity of the witnesses. The mere fact that he presented an alibi defense is not enough to support the conclusion that he invited the questions regarding the truthfulness of the eyewitnesses' testimony. See *State* v. *Ceballos,* supra, 266 Conn. 409. Accordingly, we conclude that the prosecutor's violation of *Singh* was not invited by the defendant or his attorney.

### 2

### Severity and Frequency

We next address the severity and frequency of the improper questions. Although we have concluded that four questions were improper, we nevertheless conclude that these improprieties were not frequent. In the course of this five day trial, these four improper questions were all asked during the cross-examination of one witness. On the basis of the specific circumstances present in this case, we conclude that four instances of misconduct did not constitute "frequent" misconduct.

We also conclude that the improprieties were not severe. The defendant did not object to any of the four improper questions. "Defense counsel's objection or lack thereof allows an inference that counsel did not think the remarks were severe." *State* v. *Santiago,* 269 Conn. 726, 759, 850 A.2d 199 (2004). In making the ultimate determination, we agree, and conclude that

in the context of this trial, the four questions, while improper, did not constitute "severe" misconduct.

### 3

### Curative Instructions

We next must determine whether the effect of the prosecutorial misconduct was mitigated by curative measures taken by the trial court. In this case, no specific curative measures were given because the defendant neither objected nor requested any. "[T]he defendant, by failing to bring [the improprieties] to the attention of the trial court, bears much of the responsibility for the fact that these claimed improprieties went uncured." *State* v. *Ceballos*, supra, 266 Conn. 414. The court did, however, give a general instruction that indirectly addressed the improper questions by the prosecutor. The court stated in its charge to the jury: "In short, you should bring to bear upon the testimony of the witnesses the same considerations and use the same sound judgment you apply to questions of truth and veracity as they present themselves to you in every day life. You are entitled to accept any testimony which you believe to be true and to reject either wholly or in part the testimony of any witness you believe has testified untruthfully or erroneously. The credit that you will give to the testimony offered is, as I have told you, something which you alone must determine."

"In the absence of a showing that the jury failed or declined to follow the court's [general] instructions, we presume that it heeded them." (Internal quotation marks omitted.) *State* v. *Thompson*, supra, 266 Conn. 485. On the basis of our conclusion that the improper conduct was not severe, as well as the fact that the court gave a related general instruction, we conclude that the absence of a specific curative instruction addressing the improper comments did not further prejudice the defendant.

4

## Centrality to Critical Issues in the Case and Strength of the State's Case

The final two *Williams* factors are the centrality of the prosecutorial misconduct to the critical issues of the case and the strength of the state's case. We deem it appropriate in the present case to review these factors together. See *State* v. *Ceballos*, supra, 266 Conn. 415.

Although the credibility of the witnesses was central to the state's case, the state's case was overwhelmingly strong. This was not merely a credibility contest between one defendant and one victim—this was a credibility contest, supported by physical evidence, among the defendant and Simpson, his assault victim and attempted murder victim; Dozier, an eyewitness to the assault and an attempted murder victim; and Jamison, the mother of his child, with whom he was residing at the time of the shooting. The evidence showed no connection between Jamison and the victims, and therefore no reason to suspect that she offered false testimony to corroborate the stories of Simpson and Dozier. The evidence also showed that Simpson and Dozier had no personal animus toward the defendant, and therefore no motivation to fabricate a story. The physical evidence showed conclusively that the gun from which the bullets were fired was the same gun that was recovered after Jamison told the police where she disposed of it after it was fired by the defendant. The testimony of the witnesses in this case, who had very different connections and relationships with the defendant, and which was supported by the physical evidence, strongly supported the defendant's conviction.

On the basis of our application of the six *Williams* factors to the facts of this case, we conclude that the

improprieties did not reasonably deprive the defendant of his right to a fair trial.[8]

## II

The defendant next claims that the court improperly denied his motion to suppress the pretrial identifications because the photographic arrays shown to Simpson and Dozier were unnecessarily suggestive. Specifically, he argues that (1) because he had the thinnest face of all the men in the pictures, the arrays were unnecessarily suggestive, (2) the two groups of four photographs shown to at least one of the witnesses were unnecessarily suggestive and (3) the court did not conduct a proper analysis of whether the arrays were unnecessarily suggestive. This claim is without merit.

The following additional facts are relevant to this issue. On the morning of the shooting, both Simpson and Dozier were shown photographic arrays displaying photographs of the defendant and seven other men. Both Simpson and Dozier identified the defendant as the person who fired the weapon. The defendant filed a motion to suppress Simpson's and Dozier's pretrial identifications and any resulting in-court identifications. The court held a hearing on the motion on February 1, 2002, and three days later, it denied the motion.

We begin our analysis by setting forth the relevant standard of review. "[B]ecause the issue of the reliabil-

---

[8] Although we ultimately concluded that four of the questions asked by the prosecutor were improper, we wish to note our disapproval of the manner in which the defendant raised his claim. In his brief to this court, the defendant highlighted fifty-six allegedly improper words, phrases or questions by the prosecutor. The defendant did not object to *one single remark*, out of the fifty-six, that he challenged on appeal. Our practice of affording review of unpreserved claims of prosecutorial misconduct should not be viewed as an opportunity to search the record with the proverbial "fine tooth comb," long after the trial is over and the opportunity for curative measures has passed, for any statement that, if taken out of context, could possibly be spun in an improper way.

ity of an identification involves the constitutional rights of an accused . . . we are obliged to examine the record scrupulously to determine whether the facts found are adequately supported by the evidence and whether the court's ultimate inference of reliability was reasonable. . . . [T]he required inquiry is made on an ad hoc basis and is two-pronged: first, it must be determined whether the identification procedure was unnecessarily suggestive; and second, if it is found to have been so, it must be determined whether the identification was nevertheless reliable based on an examination of the totality of the circumstances. . . . To prevail on his claim, the defendant has the burden of showing that the trial court's determinations of suggestiveness and reliability both were incorrect. . . . An identification procedure is unnecessarily suggestive only if it gives rise to a very substantial likelihood of irreparable misidentification." (Internal quotation marks omitted.) *State* v. *Cook*, 262 Conn. 825, 832, 817 A.2d 670 (2003).

We turn first to the question of whether the identification procedure was unnecessarily suggestive. After reviewing the challenged arrays, we conclude that it was not. The photographic arrays shown to both Simpson and Dozier contained pictures of the defendant as well as seven other black males who all appeared to be approximately the same age. The pictures were all close-up photographs of only the men's faces, making any excessive differences in height or weight virtually undetectable. The photographs depict men with varying facial features, as is to be expected of eight different individuals. "[T]here exists no constitutional mandate that gives the defendant the right to a photographic array of look-alikes"; *State* v. *Taylor*, 239 Conn. 481, 499–500, 687 A.2d 489 (1996), cert. denied, 521 U.S. 1121, 117 S. Ct. 2515, 138 L. Ed. 2d 1017 (1997); "[a]ny array composed of different individuals must necessarily contain certain differences." (Internal quotation

marks omitted.) *State* v. *Austin*, 244 Conn. 226, 250, 710 A.2d 732 (1998). Although the defendant's face may arguably be the thinnest of the group, it is not so different from the rest of the faces, nor are the other men's faces so similar to each other, that the defendant's picture stands out from the rest. The defendant's photograph certainly was not so distinctive as to "suggest to [the witnesses] that [the defendant] was more likely to be the culprit." (Internal quotation marks omitted.) Id.

In addition, we find no merit to the defendant's argument that showing two groups of four photographs to Simpson was unnecessarily suggestive because it narrowed the number of other suspects shown with the defendant to three instead of seven. Each witness was shown a total of eight photographs. It is wholly irrelevant that Simpson was shown two groups of photographs with four pictures in each.[9] Because we conclude that the photographic arrays were not unnecessarily suggestive, we need not reach the issue of whether the identifications were reliable.

The defendant further argues that the court improperly analyzed the facts as presented when making its determination that the arrays were not unnecessarily suggestive. The defendant argues that, because the court did not articulate its reasons for its decision and instead merely made a conclusory statement that the photographic arrays were not unnecessarily suggestive, its determination was improper.[10]

---

[9] It is unclear from the record whether Dozier viewed all eight photographs at once, two groups of four, or a book containing all eight.

[10] The court notified the defendant through the caseflow coordinator on February 4, 2002, that his motion was denied. The next day, the court addressed the defendant, stating: "The court finds that the defendant did not meet his burden of proof as it relates to the first prong, and [the court], therefore, do[es] not need to go into the second prong whether or not it was nevertheless reliable. The court doesn't find it was unnecessarily suggestive that there was a likelihood of irreparable misidentification based on the testimony presented during the hearing."

The fact that the court did not, sua sponte, articulate its reasons for denying the defendant's motion to suppress does not warrant the conclusion that the court did not make a proper determination as to the suggestibility of the arrays. "It is the appellant's burden to provide an adequate record for review. . . . It is, therefore, the responsibility of the appellant to move for an articulation or rectification of the record where the trial court has failed to state the basis of a decision . . . [or] to clarify the legal basis of a ruling . . . . In the absence of any such attempts, we decline to review this issue." (Citations omitted; internal quotation marks omitted.) *Cadlerock Properties Joint Venture, L.P.* v. *Commissioner of Environmental Protection*, 253 Conn. 661, 674–75, 757 A.2d 1 (2000), cert. denied, 531 U.S. 1148, 121 S. Ct. 1089, 148 L. Ed. 2d 963 (2001).[11] We conclude that the photographic arrays shown to Simpson and Dozier were not unnecessarily suggestive. Accordingly, the court properly denied the defendant's motion to suppress the pretrial identifications.

## III

The defendant finally claims that there was insufficient evidence to support his conviction. Specifically, he argues that there was insufficient evidence to prove beyond a reasonable doubt that he was the person who fired the gun at Simpson and Dozier. We disagree.

"The standard of review employed in a sufficiency of the evidence claim is well settled. [W]e apply a two part test. First, we construe the evidence in the light most favorable to sustaining the [finding of guilt]. Sec-

---

[11] The defendant also argues that the identifications were unreliable because there was conflicting witness testimony regarding the manner in which the photographic arrays were displayed and the amount of time it took each witness to identify the defendant. "If the procedures used to identify the defendant were not unnecessarily suggestive, we need not independently analyze whether the identification was reliable." (Internal quotation marks omitted.) *State* v. *Austin*, supra, 244 Conn. 246.

ond, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [trier of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . In this process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence." (Citation omitted; internal quotation marks omitted.) *State* v. *Griffin,* 78 Conn. App. 646, 649–50, 828 A.2d 651 (2003).

"[T]he inquiry into whether the record evidence would support a finding of guilt beyond a reasonable doubt does not require a court to ask itself whether it believes that the evidence . . . established guilt beyond a reasonable doubt. . . . Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. . . . We do not sit as a [seventh] juror who may cast a vote against the verdict based upon our feeling that some doubt of guilt is shown by the cold printed record. We have not had the jury's opportunity to observe the conduct, demeanor, and attitude of the witnesses and to gauge their credibility." (Citation omitted; internal quotation marks omitted.) *State* v. *Alford,* 37 Conn. App. 180, 184, 655 A.2d 782, cert. denied, 234 Conn. 914, 660 A.2d 357 (1995).

The state presented sufficient evidence, through the testimony of Simpson, Dozier and Jamison, to support the jury's finding that the defendant was the person who fired the weapon. Dozier testified that he knew the defendant from previous encounters when he had "seen him around" and "bumped into him." He testified

that he and the defendant previously had engaged in face-to-face disagreements. Dozier testified that on the night of the shooting, he was having a conversation with the defendant when the defendant pulled out a gun from behind his leg. Dozier testified that, when he saw the defendant raise the gun, he turned and ran toward the vehicle Simpson was driving, and then shots were fired. He testified that he did not see anyone else with a gun besides the defendant. He further testified that there was no question in his mind that the defendant was the man standing on the porch with a gun that night. He made an in-court identification of the defendant and testified that when he made a pretrial identification of the defendant, he recognized the defendant's picture right away.

The jury's finding that the defendant fired the weapon also was supported by the testimony of Simpson. Simpson testified that he had a conversation with the defendant immediately before the shots were fired. Simpson also testified that he saw the defendant on his porch, holding a gun, and was assured by the defendant that he was "straight" when he asked the defendant if he was going to shoot him. Simpson further testified that he saw the defendant fire the gun at Dozier as he ran down the street. Simpson identified the defendant, in court, as the man that fired the gun.

Finally, the jury's finding that the defendant fired the weapon was supported by Jamison's testimony. Jamison testified that she and the defendant lived together at the address where the shooting took place, and that, on the night of the shooting, she saw the defendant leave their apartment with a machine gun that she had seen in his possession approximately one month earlier. She also testified that she looked down from the second floor window and saw the tip of the gun, a person across the street and shots fire out of the gun. She stated that, after the shooting, the defendant came back upstairs

carrying the gun and that she and the defendant wrapped it in a shirt and placed it inside a book bag. She testified that she then left the apartment with the gun and went to her aunt's house, where she hid the gun inside a grill. She asserted that eventually, at the defendant's request, she gave the gun to Dontae Stallings, a friend of the defendant who lived in their building.[12] Jamison also revealed that she was incarcerated after pleading guilty to charges of hindering prosecution for hiding the weapon involved in this case.[13] Finally, Jamison testified that the defendant told her that he fired the gun from the porch and that there was no question in her mind that the defendant was the person who fired the gun from her porch.

The jury had before it ample evidence to support its finding. "This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict." (Internal quotation marks omitted.) *State* v. *Hightower*, 81 Conn. App. 377, 379, 840 A.2d 32, cert denied, 268 Conn. 918, 847 A.2d 313 (2004). "Whether [a witness'] testimony was believable was a question solely for the jury. It is . . . the absolute right and responsibility of the jury to weigh conflicting evidence and to determine the credibility of the witnesses. . . . Thus, the issue of the identification of the defendant as the perpetrator of the crime is peculiarly an issue of fact to be resolved by the jury." (Internal quotation marks omitted.) *State* v. *Miller*, 69 Conn. App. 597, 602, 795 A.2d 611, cert. denied, 260 Conn. 939, 802 A.2d 91 (2002). On the basis of the cumulative effect of the eyewitness testimony and the reasonable inferences drawn therefrom, we conclude that the jury reasonably

[12] The gun, which according to a forensics expert was used to fire shots at Simpson and Dozier, was retrieved by the police with the assistance of Stallings.

[13] At the time of the trial, Jamison was in prison awaiting sentencing.

could have found that it was the defendant who fired a weapon at Simpson and Dozier.

The judgment is affirmed.

In this opinion the other judges concurred.