## STATE OF CONNECTICUT *v.* ISMAEL NUNEZ
## (AC 24752)

Lavery, C. J., and Bishop and Hennessy, Js.

Argued November 29, 2005—officially released February 21, 2006

*Lisa J. Steele*, special public defender, for the appellant (defendant).

*Bruce R. Lockwood*, assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, and *Robin D. Cutuli*, assistant state's attorney, for the appellee (state).

*Opinion*

HENNESSY, J. The defendant, Ismael Nunez, appeals from the judgment of conviction, rendered after a jury trial, of two counts of robbery in the first degree in violation of General Statutes § 53a-134 (a) (1) and (3), two counts of burglary in the first degree in violation of General Statutes § 53a-101 (a) (1) and (2) and one count of assault in the second degree in violation of General Statutes § 53a-60 (a) (1). On appeal, the defendant claims that the trial court improperly (1) denied his request for an adverse inference instruction on the state's failure to preserve and to disclose exculpatory evidence in a timely manner, and (2) denied his motion to suppress the victim's photographic identification of him. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On April 16, 2002, the victim, Syed Ali, was closing Isabella's Market on Broad Street in Hartford for the

night when a man knocked on the front door, which was locked. The victim, without opening the door, informed the man that the store was closed for the night. Shortly after, the victim attempted to exit the store when the same man appeared at the door and forced himself and the victim into the store. While in the store, the man put a knife to the victim's throat and demanded money. The man ultimately stabbed the victim and left with approximately $160 in cash and merchandise.

After the man left, the victim exited the store where several people saw him. One of the observers called 911. Officer Seth Condon of the Hartford police department arrived and treated the victim. Condon also took a brief description of the assailant before an ambulance arrived. The victim was then driven to a hospital in the ambulance. At the hospital, Condon interviewed the victim again. The victim gave a more detailed description of the assailant, including the fact that the assailant had been wearing a baseball cap and eyeglasses. The victim also indicated that the assailant may have left the cap and eyeglasses at the store. Shortly after the robbery, police found a blue baseball cap at the scene, but did not find any eyeglasses. The eyeglasses were found by members of the victim's family the next day, while they were cleaning the store after the robbery. The eyeglasses were then put aside. Approximately two and one-half months later, the victim gave the glasses to Madison Bolden, an inspector for the office of the state's attorney.

Eight days later, Detective Winston Brooks, the lead investigator, interviewed the defendant about the robbery. The defendant admitted to participating in the robbery, but he claimed that he was only a lookout and that it was another man, "Kojak," who actually assaulted the victim. From that information, Brooks prepared two photographic arrays, one containing a photograph of the defendant and the other containing a photograph of Kojak.

On April 30, 2002, Brooks showed the arrays of photographs to the victim. The victim was first shown the array containing a photograph of Kojak. The victim did not identify anyone in that array. The victim was next shown the array containing the photograph of the defendant. The victim identified the defendant as his assailant. As a result, the defendant was arrested and charged with robbery, burglary and assault.

On July 9, 2002, the victim gave Bolden an envelope containing the eyeglasses that were found at the store. Bolden observed a reddish smudge on the eyeglasses, which he believed may have been blood. Bolden made a note of the observation, which he put in his file. Approximately one year later, the defendant's attorney was notified about the eyeglasses but was not told about the inspector's observation. The eyeglasses were given to an optometrist hired by the defendant in order to determine if they might belong to someone other than the defendant. The optometrist, after cleaning and examining the eyeglasses, determined that the eyeglasses were not those that would be prescribed for use by the defendant.

During the trial, Bolden testified about the reddish smudge he observed on the eyeglasses. Later that day, the state, for the first time, notified the defendant's attorney about Bolden's note regarding the reddish smudge on the eyeglasses. As a result, the eyeglasses were again sent for testing, this time to determine if the smudge on the eyeglasses was blood and to determine whose blood it was. No blood was found because the eyeglasses previously had been cleaned. The envelope in which the eyeglasses were submitted, however, contained brownish stains. Those stains tested negative for the presence of blood. Additional facts will be set forth as necessary.

I

The defendant first claims that the court improperly denied his request for an adverse inference instruction

on the state's failure to preserve and to disclose the reddish smudge on the eyeglasses in a timely manner. He specifically argues that the state's failure to do so violated his right to due process under the state constitution and, thus, an adverse inference instruction was necessary to remedy the violation.[1]

"[I]n determining whether a defendant has been afforded due process of law under the state constitution, the trial court must employ the [State v. Asherman, 193 Conn. 695, 724, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985)] balancing test, weighing the reasons for the unavailability of the evidence against the degree of prejudice to the accused. More specifically, the trial court must balance the totality of the circumstances surrounding the missing evidence, including the following factors: the materiality of the missing evidence, the likelihood of mistaken interpretation of it by witnesses or the jury, the reason for its nonavailability to the defense and the prejudice to the defendant caused by the unavailability of the evidence. . . . If the court finds that the defendant has been prejudiced as a result of the lost evidence, it may take whatever action it deems necessary in order to provide a proper remedy." (Citations omitted; internal quotation marks omitted.) State v. Morales, 90 Conn. App. 82, 88–89, 876 A.2d 561, cert. denied, 275 Conn. 924, 883 A.2d 1250 (2005).

Here, the court examined the underlying facts and determined that the unavailability of the reddish

---

[1] The defendant also made an oral motion for a mistrial and filed a motion for a new trial. The court denied both. The defendant argues in his brief that the court "abused its discretion in resolving three defense motions regarding the state's failure to timely notify the defense" about a reddish smudge found on the eyeglasses. The defendant has addressed only the request for an adverse inference instruction. He did not address the other two motions. Because the defendant did not brief his claims as to the other two motions, we will treat them as abandoned on appeal. See Legnos v. Legnos, 70 Conn. App. 349, 355, 797 A.2d 1184, cert. denied, 261 Conn. 911, 806 A.2d 48 (2002).

smudge on the eyeglasses did not constitute a due process violation and, thus, an adverse inference instruction was not necessary. "[W]hether those facts constituted a violation of the [defendant's right to due process] is a mixed determination of law and fact that requires the application of legal principles to the historical facts of the case. . . . Whether the historical facts as found by the [trial] court constituted a violation of the [defendant's right to due process] is subject to plenary review by this court, unfettered by the clearly erroneous standard." (Internal quotation marks omitted.) *State* v. *Morales*, 39 Conn. App. 617, 623, 667 A.2d 68, cert. denied, 235 Conn. 938, 668 A.2d 376 (1995). After our examination of the facts and the record in this case, we conclude that the court properly determined that the state's failure to preserve and to disclose the reddish smudge on the eyeglasses in a timely manner did not deprive the defendant of his right to due process under the state constitution.

It is pure speculation that the eyeglasses were worn by the assailant. Although the victim testified that the assailant wore eyeglasses, he could not identify the eyeglasses found at the scene the next day as the same eyeglasses that were worn by the assailant. In addition, the police searched the crime scene immediately after the robbery and did not find any eyeglasses. Instead, the eyeglasses were found the day after the robbery by members of the victim's family. It is therefore uncertain whether the eyeglasses belonged to the assailant.

It is also pure speculation that the reddish smudge was in fact blood. The eyeglasses were handled by multiple individuals, including the defendant's expert. Only one of those individuals observed a reddish smudge on them and that individual testified that he was uncertain whether the smudge was blood. In addition, a similar substance was found in the envelope containing the

eyeglasses. That substance was tested, and it was determined that the substance was not blood. It is therefore uncertain whether the smudge on the eyeglasses was blood.

Even if we were to assume arguendo that the reddish smudge was in fact blood, the defendant was not prejudiced by its unavailability. The defendant argues that he was prejudiced because the blood may have shown that the eyeglasses belonged to a third party. The defendant already offered evidence that the eyeglasses did not belong to him when his expert testified that the prescription for the eyeglasses was not that which would be prescribed for use by the defendant. If a test revealed that the blood came from a third party, that would have been only additional evidence that the eyeglasses did not belong to the defendant. Additionally, the victim testified that the assailant did not bleed during the robbery and, thus, there is nothing in the record that suggests that the blood came from the assailant.

The defendant also argues the he was prejudiced because the blood may have come from the victim. Even if we were to assume that the reddish smudge was the victim's blood, we fail to see how that would exculpate the defendant. The record does not show, and a test would not reveal, when or how the blood appeared on the eyeglasses. Similarly, although the prescription for the eyeglasses did not match that which would be prescribed for the defendant, we are not persuaded, after reviewing the record, by the defendant's argument that he could not have worn the eyeglasses and committed the crimes because he would have been unable to see. Finally, the victim also identified the defendant as the assailant numerous times, including during an in-court identification in front of the jury. Applying the *Asherman* factors, we therefore conclude that the court correctly determined that the state's failure to preserve and to disclose the reddish smudge on

the eyeglasses in a timely manner did not violate the defendant's right to due process under the state constitution.[2]

## II

The defendant next claims that the court improperly denied his motion to suppress the victim's photographic identification of him. He specifically argues that the identification procedure was unnecessarily suggestive and unreliable. He then argues that this court should adopt double-blind, sequential identification procedures[3] under our state constitution. We will address each argument in turn.

The following additional facts and procedural history are relevant to the defendant's claims. The defendant filed a motion to suppress the victim's photographic identification of him. The court denied the motion on the basis of the following factual findings. The victim was shown two photographic arrays by an officer who was aware of which array contained a photograph of the suspect. The two arrays contained a total of eleven or twelve[4] individuals in a total of sixteen photographs. No array contained the same individual more than once, although some individuals were contained in both arrays. Both arrays contained eights photographs of

---

[2] Regarding the other *Asherman* factors, there was no likelihood of mistaken interpretation by the jury because the defendant offered evidence on the issue and argued an adverse inference against the state in his closing argument. In fact, the defendant declined the court's invitation to offer more evidence on the issue.

[3] A double-blind photographic identification procedure is one in which "the officer conducting [the procedure] has not been involved in the investigation and does not know who the target is." *People* v. *Woolcock*, 7 Misc. 3d 203, 207, 792 N.Y.S.2d 804 (2005). A sequential photographic identification procedure "involve[s] showing the witness the suspect and other fillers on the identification procedure one at a time, rather than the traditional practice of simultaneous presentation." Id.

[4] Both parties and the court are not certain of the exact number. The uncertainty does not affect our analysis.

Hispanic males of various heights and weights, but with similar characteristics, including short hair and facial hair. Five of the photographs contained visible height markers. The photograph of the defendant contained a visible height marker outlined in white. His was the only height marker outlined in white and was the only height marker noted in inches. The remaining height markers were not outlined in white and were displayed in feet.

The victim did not identify anyone from the first array. After reviewing the second array, the victim identified the defendant as his attacker and memorialized his identification by circling and initialing the photograph. The victim claimed that he was "101 percent" confident in his identification. The court also found that the victim struggled with the defendant for several minutes in the store, "during which time he was face-to-face with his assailant in a well lit store."

## A

We first address the defendant's claim that the identification procedure was unnecessarily suggestive and unreliable. "We begin our analysis by setting forth the relevant standard of review. [B]ecause the issue of the reliability of an identification involves the constitutional rights of an accused . . . we are obliged to examine the record scrupulously to determine whether the facts found are adequately supported by the evidence and whether the court's ultimate inference of reliability was reasonable." (Internal quotation marks omitted.) *State* v. *Harris*, 85 Conn. App. 637, 648–49, 858 A.2d 284, cert. denied, 272 Conn. 901, 863 A.2d 695 (2004). "To determine whether a pretrial identification procedure, such as the photographic array in this case, violated a defendant's due process rights, the required inquiry is made on an ad hoc basis and is two-pronged: first, it must be determined whether the identification proce-

dure was unnecessarily suggestive; and second, if it is found to have been so, it must be determined whether the identification was nevertheless reliable based on an examination of the totality of the circumstances. . . . An identification procedure is unnecessarily suggestive only if it gives rise to a very substantial likelihood of irreparable misidentification. . . . The defendant bears the burden of proving both that the identification procedures were unnecessarily suggestive and that the resulting identification was unreliable." (Internal quotation marks omitted.) *State* v. *Blackwell*, 86 Conn. App. 409, 414, 861 A.2d 548 (2004), cert. denied, 272 Conn. 922, 867 A.2d 838 (2005).

We turn first to the question of whether the identification procedure was unnecessarily suggestive. The defendant argues that the array was unnecessarily suggestive because (1) his photograph was the only one in which a height marker was outlined in white, (2) the defendant was taller than all the other suspects, (3) several individuals were repeated in both arrays and (4) the test was not double-blind or sequential. We are not persuaded by those arguments.

Our Supreme Court has routinely held that "there exists no constitutional mandate that gives the defendant the right to a photographic array of look-alikes"; *State* v. *Taylor*, 239 Conn. 481, 499–500, 687 A.2d 489 (1996), cert. denied, 521 U.S. 1121, 117 S. Ct. 2515, 138 L. Ed. 2d 1017 (1997); and, thus, the slight height difference was of no consequence. In addition, the height difference related only to a limited number of individuals because a majority of the photographs did not contain height markers. Our Supreme Court has also held that duplication of individuals between multiple arrays does not violate the defendant's rights unless it unnecessarily emphasizes the defendant's photograph. *State* v. *Milner*, 206 Conn. 512, 535–36, 539 A.2d 80 (1988). Here, the defendant was one of six individuals

whose images were not duplicated and, thus, the duplication of photographs of other individuals did not unnecessarily emphasize the defendant's photograph. We also fail to find any authority that supports the defendant's argument that the array was unnecessarily suggestive because it was not conducted in a double-blind, sequential manner.

We are also not persuaded by the defendant's argument that the identification procedure was unnecessarily suggestive because his photograph was the only one in which the height marker was outlined in white. Photographs will often have distinguishing features. The question, however, is not whether the defendant's photograph could be distinguished from the other photographs, but whether the distinction made it unnecessarily suggestive. After reviewing the challenged arrays, we conclude that the white outlined height marker did not make the defendant's photograph unnecessarily suggestive.

The defendant further claims that the identification procedure was unreliable. He argues that in light of the scientific findings cited in *State* v. *Ledbetter*, 275 Conn. 534, 881 A.2d 290 (2005), the court "placed too much weight on [the victim's] assessment of his identification's reliability" in determining that the identification procedure was reliable. Because we hold that the identification procedure in this case was not unnecessarily suggestive, we need not address the second prong, whether the resulting identification was unreliable. See *State* v. *Vaughn*, 199 Conn. 557, 565, 508 A.2d 430, cert. denied, 479 U.S. 989, 107 S. Ct. 583, 93 L. Ed. 2d 585 (1986).

B

We next turn to the defendant's state constitutional claim. The defendant argues that we should adopt a double-blind, sequential identification procedure under

our state constitution.[5] The defendant concedes that his claim was not preserved at trial and now seeks review pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). Under *Golding*, a defendant can prevail on an unpreserved claim of constitutional error "only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." We will review the defendant's claim because the record is adequate for review, and the claim is of constitutional magnitude. See *State* v. *Taylor*, supra, 239 Conn. 498.

We conclude, however, that the claim must fail because the defendant has not established that a constitutional violation clearly exists and clearly deprived him of a fair trial. "It is well established that federal constitutional and statutory law establishes a minimum

---

[5] Traditionally, our courts have used the factors set forth in *Neil* v. *Biggers*, 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972), to determine whether an identification was deemed reliable under the federal constitution. *State* v. *Evans*, 44 Conn. App. 307, 318, 689 A.2d 494, cert. denied, 240 Conn. 924, 692 A.2d 819 (1997). Our Supreme Court has recently held that "our state constitution does not require that we abandon the *Biggers* factors as the appropriate factors for consideration in determining whether an unnecessarily suggestive identification procedure is, nevertheless, reliable . . . ." *State* v. *Ledbetter*, supra, 275 Conn. 569. In his state constitutional claim, the defendant argues, in part, that our state constitution requires us to abandon or to modify the current factors used to determine whether an identification procedure was reliable. Although the defendant tried to distinguish *Ledbetter* from that portion of his claim, we are not persuaded. As a result, we hold that *Ledbetter* has decided the issue and, thus, hold that our state constitution does not warrant a departure from or modification of the *Biggers* factors. See id. We, however, agree with the defendant that the portion of his claim relating to the unnecessarily suggestiveness prong is one of first impression and, thus, we focus solely on that portion of his claim.

national standard for the exercise of individual rights and does not inhibit state governments from affording higher levels of protection for such rights." Furthermore, although we often rely on the United States Supreme Court's interpretation of the amendments to the constitution of the United States to delineate the boundaries of the protections provided by the constitution of Connecticut, we have also recognized that, in some instances, our state constitution provides protections beyond those provided by the federal constitution, as that document has been interpreted by the United States Supreme Court. "The analytical framework by which we determine whether, in any given instance, our state constitution affords broader protection to our citizens than the federal constitutional minimum is well settled. In *State* v. *Geisler*, [222 Conn. 672, 684–86, 610 A.2d 1225 (1992), our Supreme Court] enumerated the following six factors to be considered in determining that issue: (1) persuasive relevant federal precedents; (2) the text of the operative constitutional provisions; (3) historical insights into the intent of our constitutional forebears; (4) related Connecticut precedents; (5) persuasive precedents of other state courts; and (6) contemporary understandings of applicable economic and sociological norms, or as otherwise described, relevant public policies." (Internal quotation marks omitted.) *State* v. *Ledbetter*, supra, 275 Conn. 560–61.

After considering the six *Geisler* factors, we hold that our state constitution does not require that identifications be conducted in a double-blind, sequential manner and, thus, a constitutional violation does not clearly exist. The first factor, persuasive federal precedent, favors the state. We have not found, and the defendant has not cited, any federal precedent that requires or suggests that identifications should be conducted in a double-blind, sequential manner. In fact, the United States Supreme Court has long permitted the use of

traditional identification procedures.[6] See, e.g., *Simmons* v. *United States*, 390 U.S. 377, 394, 88 S. Ct. 967, 19 L. Ed. 2d 1247 (1968); see also *United States* v. *Ash*, 413 U.S. 300, 313, 93 S. Ct. 2568, 37 L. Ed. 2d 619 (1973).

The second factor, the textual approach, also favors the state because the "due process clauses of the state and federal constitutions are virtually identical." *State* v. *Ledbetter*, supra, 275 Conn. 562 ("similarity between the two provisions does not support that article first, § 8, of the Connecticut constitution offers greater protection in the area of defendant identification procedures than the federal constitution").

The third factor, the historical approach, is neutral. We cannot find, and the parties do not offer, any relevant insight into the intent of the framers of our constitution regarding the issue. See id., 563.

The fourth factor, the holdings and dicta of Connecticut appellate courts, is neutral. Our appellate courts have not had the opportunity to decide whether our state constitution requires identifications to be conducted in a double-blind, sequential manner; there is nothing in our decisional law that touches on the issue.

The fifth factor, the sibling approach, favors the state. Although the issue has barely been addressed by the appellate courts of our sister states, a recent New York trial court observed that "[n]o court has yet held that the failure to employ either or both sequential or double-blind [identification] procedures renders the traditional identification procedure inherently suggestive or infirm." *People* v. *Woolcock*, 7 Misc. 3d 203, 207 n.2, 792 N.Y.S.2d 804 (2005).

The sixth factor, economic and sociological considerations, favors the defendant. There is no question that

---

[6] The phrase "traditional procedures" will be used to describe all constitutionally accepted identification procedures not conducted in a double-blind, sequential manner.

the limited research presented by the defendant favors double-blind, sequential identification procedures. There is also little question that the limited research presented by the defendant shows that double-blind, sequential identification procedures are less suggestive than the traditional procedures. The question before this court, however, is not whether a double-blind, sequential identification procedure is less suggestive than the traditional procedures, but instead, whether the traditional procedures are unnecessarily suggestive under our state constitution. Given the limited number of studies on the subject, we are not convinced, at the present time, that our state constitution requires us to adopt double-blind, sequential identification procedures because the traditional procedures are unnecessarily suggestive. We therefore hold that the defendant has not established that a constitutional violation clearly exists and clearly deprived him of a fair trial and, thus, his claim must fail under the third prong of *Golding*.[7]

The judgment is affirmed.

In this opinion the other judges concurred.

---

[7] For the same reasons, we hold that the defendant's claim that he was entitled to a jury instruction warning of the risks associated with identifications not conducted in a double-blind, sequential manner fails to satisfy *Golding*. The defendant does not have a state or federal constitutional right to such a jury instruction. See part I. We also decline the defendant's invitation to invoke our supervisory authority and to direct our trial courts to incorporate his proposed jury instruction in cases in which an identification was not conducted in a double-blind, sequential manner.